1          UNITED STATES DISTRICT COURT

2       WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3    _____

4                                 )
     DAVID GOLDSTINE,             )  C18-1164-MJP
5                                 )
               Plaintiff,         )  SEATTLE, WASHINGTON
6                                 )
     v.                           )  December 10, 2019
7                                 )
     FEDEX FREIGHT INC.,          )  8:30 a.m.
8                                 )
               Defendant.         )
9
10   _____

11          VERBATIM REPORT OF PROCEEDINGS
         BEFORE THE HONORABLE MARSHA J. PECHMAN
            UNITED STATES DISTRICT JUDGE
12   _____

13   APPEARANCES:

14     For the Plaintiff:      Ada K. Wong
                               Jordan T. Wada
15                             AKW LAW P.C.
                               6100 219th Street SW, Suite 480
16                             Seattle, WA  98043

17                             Beth A. Bloom
                               Bloom Law
18                             3827-C South Edmunds Street
                               Seattle, WA  98118

19

20     For the Defendant:      Donald H. Snook
                               Sandra C. Isom
21                             FedEx Freight
                               1717 Aaron Brenner, Suite 600
22                             Memphis, TN 38120

23                             Medora A. Marisseau
                               Karr Tuttle Campbell
24                             701 Fifth Avenue, Suite 3300
                               Seattle, WA  98104

25

1        THE COURT:  Okay, counsel, first of all, I read the

2    deposition that you asked me to read.  And, quite honestly, I

3    don't know why, because there were only two objections and

4    they weren't sustained -- how do I want to put it?  The

5    defense didn't continue them.  In other words, they didn't

6    say that they wished to preserve their objections.  So

7    everything you have there is appropriate to read.  Okay?

8      All right.  Let's get back to this issue of the benefits

9    and when the information was forthcoming and when it was

10   requested.

11     Ms. Wong?

12        MS. WONG:  Yes, Your Honor, so we asked for

13   plaintiff's entire employment file.  And we were told that we

14   received everything.  We didn't.  We came to realize there

15   were additional information benefits.

16     So then we --

17        THE COURT:  So I take it the benefits are not

18   contained in an employment file?

19        MS. WONG:  Correct.

20        THE COURT:  So it's not unusual for corporations to,

21   unless you say "Mother may I" asking for employment file

22   versus benefits file versus whatever HR file.  They label

23   them different things.  Did you proceed to ask them in

24   different ways for what you wanted?

25        MS. WONG:  Yes.  We asked for everything.  It's a

1    block paragraph.  We asked for employment file, personnel

2    file, records, rates of pay -- and the list goes on -- his

3    time sheets and everything.  We got most of it.  We didn't

4    get anything from benefits.

5        And so then we, in our notice of deposition for 30(b)(6)

6    testimony, we specifically spelled out a line for

7    compensation, plaintiff's rates of pay.  Defendant objected

8    to designating somebody to talk about this topic.  I put this

9    on the record during the deposition itself.  And then we met

10   and conferred again after that.  And I can hand these up to

11   Your Honor.  With the first document being April 24th where

12   we said that FedEx has not designated somebody to talk about

13   that specific topic.  And then he was -- Mr. Snook was going

14   to get somebody to write up a compensation explanation for

15   everything that's on these paychecks.

16       And I can also hand up the paychecks that we did look at

17   in the deposition and were produced.  And they talk

18   specifically about these benefits:  Cancer; 401-K; FSA; life

19   insurance; dental; medical; life; vision.  So we have all of

20   these.

21       I also have the portion of the deposition transcript; if

22   Your Honor would like to take a look; where Mr. Snook

23   specifically said he was not going to designate somebody on

24   that very specific topic.  So when our expert report was due

25   in May, we wanted to meet the deadline, so we had Dr. Tapia

1    provide her expert report.  And she specifically stated --

2    and I could hand this up as well -- that while the earnings

3    records show that Mr. Goldstine had health benefits with his

4    work at FedEx, additional information is needed, if any, as

5    to these benefits and the cost for Mr. Goldstine.  And that

6    she specifically reserved the right to revise this

7    preliminary analysis accordingly.  So we have provided them

8    notice.  We provided them with Dr. Tapia's report.

9         Then we followed up again in June after we provided the

10   report, with the notice that she was waiting on this benefits

11   information, stating that we needed this benefits

12   information, 401-K, medical, dental, which appears as line

13   item deductions in the earnings report that was provided by

14   FedEx.

15        We have since followed up.  We've continued to follow up.

16   We recently sent Mr. Snook e-mails.  And we haven't gotten

17   anything.  So we believe that they were provided notice.

18   They knew that we were waiting on them to provide us with the

19   benefits information so that Dr. Tapia could supplement her

20   report.

21        THE COURT:  What's the first date that you asked for

22   this benefits information?

23        MS. WONG:  April.  Well, let me take that back.  When

24   we provided them with our notice of 30(b)(6) deposition,

25   which was earlier this year, I want to say it's January.  And

1  then we asked for the personnel file, I believe usually in

2  our first set of discovery back in September 2018.

3         THE COURT:  And were these requests part of your

4  request in your set of discovery that I issued the 7-day

5  order on?

6         MS. WONG:  I believe so, Your Honor.

7         THE COURT:  Can you tell me where in the request it

8  will be specifically covered?

9         MS. WONG:  Yes.  We asked for the personnel file to

10 find the specific number, which might take me a bit --

11        THE COURT:  So you asked for the personnel file?

12        MS. WONG:  Yes.  I don't think there's a dispute that

13 we asked for the personnel file during this set of discovery.

14 We even had extensive conversations about this in written

15 discovery amongst various 30(b)(6) designees.

16        THE COURT:  So we have a complete record.  You

17 supplemented your exert report on what date?

18        MS. WONG:  We supplemented our expert report in the

19 last couple weeks, I want to say it's November.

20        THE COURT:  So when you --

21        MS. WONG:  That was based on a couple pieces of

22 information that Mr. Goldstine found, as we told him we were

23 really not going to get these benefits.  We even had

24 Mr. Goldstine himself call FedEx HR, write to FedEx HR, and

25 no response.

1          THE COURT:  Okay.  And did the defense ever take

2     Dr. Tapia's deposition?

3          MS. WONG:  They didn't.  They never said that they

4     wanted to, even after her initial report providing notice

5     about the supplementation of benefits.

6          THE COURT:  Okay.  Now, let's get back to the Tapia

7     report and why it is calculated only to age 60.  How did that

8     happen?

9          MS. WONG:  She calculated that rate based on average

10    retirement age.

11         THE COURT:  For truckers or for the population as a

12    whole?

13         MS. WONG:  Population in general.

14         THE COURT:  Age 60?

15         MS. WONG:  I think it was 62.5.

16         THE COURT:  Is it 60 or 62.5?

17         MS. BLOOM:  I'm sorry, Your Honor.

18         MS. WONG:  63.8.  It's the average work-life

19    expectancy.

20         THE COURT:  All right.  And what's the difference in

21    the swing between the two reports?

22         MS. WONG:  Between the two reports she has some

23    additional benefits information.  I believe she used the

24    department's average statistics, because she didn't have

25    specific benefits for Mr. Goldstine, as well as the age

1    difference.

2         THE COURT:  Now, Ms. Wong, if you weren't getting

3    these materials why didn't you come to me and ask for an

4    order to compel?  You knew how to do that and I granted you

5    one.

6         MS. WONG:  Yeah.  So we were told we were going to

7    get it.  And we didn't think we weren't going to get it.  And

8    I had filed three motions to compel at that time and you

9    provided a deadline for, I believe it was the LCR Rule 37 to

10   engage in.  And even after that we thought we were going to

11   get it.  We didn't think that the defendant was going to

12   raise an objection, knowing that this was in her report and

13   that's what she was waiting for.

14        THE COURT:  And so you believed them?

15        MS. WONG:  Yeah.

16        THE COURT:  All right.  So tell me what the swing is.

17        MS. WONG:  So the total amount of the first report

18   would be about $288,000.  And then for the supplemental

19   report it's about $605,000.

20        THE COURT:  So you have a swing of over $400,000; is

21   that what you're saying?

22        MS. WONG:  Correct.

23        THE COURT:  All right.  Thank you.  Mr. Snook?

24        MS. SNOOK:  Yes, judge.  What I understand what you

25   wanted us to address specifically -- we're talking about the

 1  benefits first.  What we -- what I promised to do was

 2  contained in the meet-and-confer letter from Mr. Wada, which

 3  I believe has been produced as part of this dispute.  But it

 4  says that this is an explanation of our discussion, Jordan

 5  and I's discussion.

 6      He says that you -- me -- stated you will ask if you can

 7  produce a document with this information.  So that's what our

 8  agreement was on June 5th.

 9      That June 5th call, by the way Your Honor, was as a result

10  of your order that we get together and discuss all of the

11  issues that were a part of the second motion to compel, and I

12  think the third motion to compel.  So we discussed a whole

13  bunch of stuff on that day.  And what I said was that I would

14  ask if I could produce a document with this information.

15      Now, what they were seeking was numbers that FedEx paid

16  for his benefits.  I understand that's a relevance argument.

17  That wouldn't be relevant to any calculation of his lost

18  benefits.  But the response was -- when I asked about, can we

19  produce this document -- was that Mr. Goldstine has access to

20  this document, all of this information himself.  He still can

21  get on line.  And we know that because he has gotten on line

22  to produce the documents to his attorneys just recently.

23          THE COURT:  And did you write back and say where they

24  could find it on line?

25          MS. SNOOK:  I didn't.

 1          THE COURT:  And what makes you think that that's

 2   adequate when we're dealing with interrogatories that are

 3   asking for specific things?

 4          MS. SNOOK:  Well, let's be clear.  This was not an

 5   interrogatory.  The interrogatories or request for

 6   production, I've been reviewing them -- Ms. Wong couldn't

 7   identify a number for you -- I've been reviewing them, I

 8   don't think there's one that says they wanted the benefits.

 9          THE COURT:  Did you -- did she identify that she

10   wanted all the files?

11          MS. SNOOK:  Do you mean just informally?

12          THE COURT:  No, in the interrogatories?  She just

13   told me that she asked for all of his personnel files.

14          MS. SNOOK:  She was provided his personnel files.

15   And I'm not sure that it asked for anything that would

16   include this benefits information.

17          THE COURT:  So you knew that they were after the

18   benefits from the meet-and-confer, however?

19          MS. SNOOK:  Yes, I knew that they wanted them.

20          THE COURT:  Mr. Snook, this isn't your first rodeo,

21   as you've explained to me before.

22          MS. SNOOK:  It is not, Your Honor.

23          THE COURT:  And have you ever been in an employment

24   case that was adequately litigated where somebody didn't ask

25   for the benefits?

1    MS. SNOOK:  Your Honor, what they requested was the

2    information that was contained on his paychecks.  And we did,

3    in fact, provide his paychecks.  He had them, and we provided

4    additional ones.

5    THE COURT:  That's not what I asked you.  They asked

6    for the benefits.  If he was receiving health insurance.  Is

7    there life insurance here?  Is there some other benefit?

8    What kind of benefits does FedEx provide?

9    MS. SNOOK:  What FedEx provides he is aware of and

10   that is on his paycheck.

11   THE COURT:  I don't know what FedEx provides, so you

12   need to tell me.  What does FedEx provide?

13   MS. SNOOK:  I can tell you what I think I remember,

14   which is short-term disability, long-term disability.

15   There's some company-paid life insurance.  There's health

16   insurance.  401-K.  Am I leaving anything out?  There's

17   pension information, which is all contained on the paycheck.

18   THE COURT:  In each category?

19   MS. SNOOK:  The pension is not included on the

20   paycheck.

21   THE COURT:  There are some things not included on the

22   paycheck.  And one might want to see how long one has to wait

23   for short-term disability or long-term disability or what the

24   cost of the premiums are for benefits.

25   MS. SNOOK:  None of that would be used to calculate

1  the lost benefits by the expert.  She wouldn't be able to use

2  that.

3       THE COURT:  How do you know?  You didn't depose her.

4  You didn't ask her.

5       MS. SNOOK:  Yeah, he can request that information

6  under ERISA.  And by the way, Your Honor, none of that is in

7  the employment file.  None of that.  And we did provide the

8  employee file.

9       THE COURT:  That's what I understand, that many times

10  companies keep these in different places.  But the point is,

11  one of the things you were looking for is benefits.  And you

12  did have a discussion about that and you told them that you

13  would ask.  And presumably that implies an obligation to get

14  back to them.

15       MS. SNOOK:  And on June 5th we did have a discussion

16  about a whole lot of issues.  And we had a whole lot of

17  discovery issues which we were able to discuss and talk about

18  and resolve and we set deadlines for when we would produce

19  documents.  And we did all those things.  And what I promised

20  to do that day, Your Honor, was ask whether I could produce

21  that information or not.

22       THE COURT:  Did you do so?

23       MS. SNOOK:  I did, Your Honor.

24       THE COURT:  Where is it documented?

25       MS. SNOOK:  Well, I did it orally.

1          THE COURT:  How are they supposed to know that that's

2     what you did?

3          MS. SNOOK:  I should have told them that I asked and

4     the answer was he already has access to it.  And we know that

5     he knows that.

6          THE COURT:  That's -- you know, if you thought that

7     was an adequate answer, why didn't you ask me if that's the

8     way you can answer the interrogatory?  Because I don't

9     consider that an adequate answer when somebody has asked for

10     it is, "Go search for it on your own."

11          MS. SNOOK:  Hold on, let's be clear.  This is not an

12     interrogatory.  This is not an issue related to discovery

13     through interrogatories or requests for production.  This is

14     our discussion as a result of 30(b)(6) issues.  Again, I did

15     not fail to answer an interrogatory on this or request for

16     production.

17          THE COURT:  Now, why is it that you refused to

18     produce a 30(b)(6) witness who could talk to these issues?

19          MS. SNOOK:  Well, there was a whole list of things

20     that they wanted one person to talk about.  Rates of pay,

21     which we said, well, that's on the paychecks which you've

22     got.  They wanted other issues.  And they wanted to know how

23     much FedEx had paid.  And I wasn't able to figure out one

24     person who could answer all those.  And the issue was, he had

25     the access to the information.  It's publicly available --

 1  not publicly -- it's available to employees who have been

 2  part of the system.  And we know that because he's produced

 3  that.

 4          THE COURT:  Well, obviously somebody gathered that

 5  information and put it in a place where the employees can

 6  find it.  Why couldn't you find a 30(b)(6) expert -- or

 7  excuse me -- 30(b)(6) witness to help with locating those

 8  materials?

 9          MS. SNOOK:  Your Honor, what I can tell you is that

10  we had dozens of issues that we had to resolve and try to

11  work out.  And we were focused on resolving them.  And then

12  when some of these tangential ones came up, we tried to

13  resolve as many as we could.  And then I never heard anything

14  else for months about these benefits.  For months.

15          THE COURT:  And you never came to me and said, "We

16  have other issues that need to be resolved."

17          MS. SNOOK:  I didn't, no.  And Ms. Wong did not file

18  a follow-up saying, "Hey, we want this, too."  I agree with

19  Your Honor that if they continued after June 6th or June 5th

20  to feel -- or July 1st that it should have been produced and

21  that I failed to:  One, they should have told you, "Hey,

22  Mr. Snook said he would and he never told us what the answer

23  was.  We want these documents and we want you to order him to

24  produce the documents."

25          THE COURT:  Well, Mr. Snook, it appears to me that

1  you didn't carry through on what you said you were going to

2  do, by communicating back.  And you didn't carry through -- I

3  don't consider it:  Go look for it wherever, a sufficient

4  answer, when you're in litigation in response to requests,

5  whether it comes in an interrogatory or whether it comes as a

6  30(b)(6) discussion.  So I find that you've woefully

7  inadequately supplied them with information.  Now, how do you

8  propose we fix that?

9       MS. SNOOK:  Well, I suppose we need to have a

10 discussion about whether what FedEx paid for the benefits,

11 which is what they're telling you they wanted, whether that

12 is even what the standard is.  And we don't believe it is.

13      THE COURT:  Well, I'm assuming that they wanted to

14 know what all the benefits were, not what FedEx paid for

15 them, but what the value of it is to the employee.

16      MS. SNOOK:  That's not what they asked for, Your

17 Honor.  This says, "We need to determine the amounts FedEx

18 paid for plaintiff's benefits."  And it says, "Which appear

19 as line item deductions on his FedEx earnings statements."

20 So I don't want to disagree with you too much, but it does

21 say what they wanted, which is what FedEx paid.  And that is

22 not what can be used by the expert to calculate.

23      THE COURT:  Says who?

24      MS. SNOOK:  Says the case that we cited in our trial

25 brief -- supplemental.

1          THE COURT:  How do you know what it is that they were

2     going to use if they got the materials?  In other words, if

3     they got an explanation of the benefits, how do you know that

4     they wouldn't have followed up with additional questions?

5          MS. SNOOK:  They may have, but what they asked for is

6     what FedEx paid.

7          THE COURT:  Had they got that information, that's the

8     whole reason you do 30(b)(6) and you do interrogatories is so

9     that you can see what's there and then follow up.  Is that

10    fair?

11         MS. SNOOK:  That would be fair.  In this case we were

12    right at the close of discovery.  And I agree with you that

13    had they said to you, Judge, Mr. Snook promised this, he

14    didn't get it, likely you would have given them more time and

15    we would have gone through that process and we would have

16    been ordered to produce it or not ordered to produce it,

17    however you would have decided, and it would have been

18    resolved.

19       But they didn't do anything about it.  They let it go.

20    They didn't ask about it.  It went for a long time without

21    them saying, "Hey, why didn't you give us this stuff?"

22         THE COURT:  You're obligated to give it whether or

23    not they followed through on it.  And I haven't heard an

24    explanation about why that is.  You were ordered to meet and

25    confer.

1              MS. SNOOK:  Yes, and we did.

2              THE COURT:  And I believe I probably said if you have

3     other unresolved issues you bring them back to me.

4              MS. SNOOK:  You did.

5              THE COURT:  And you used a -- you're supposed to use

6     a local Rule 37 joint presentation.

7              MS. SNOOK:  I agree.  And they did not do that.

8              THE COURT:  And you didn't either.

9              MS. SNOOK:  I didn't have anything to compel.  I

10    didn't have anything I wanted to say.

11             THE COURT:  You had a disagreement, Mr. Snook, that

12    could not be resolved.

13             MS. SNOOK:  I suppose that's true, although I didn't

14    have any reason to file a motion to ask you to order

15    anything.

16             THE COURT:  Now, how are we going to fix this?

17             MS. SNOOK:  I suppose, Your Honor, that we should

18    present the argument about why it's irrelevant and doesn't

19    matter anyway.

20             THE COURT:  That's going to be a tough row to hoe,

21    because I actually think that benefits in employment

22    discrimination cases are important things.  And just about

23    every lawyer worth their salt is going to want to know that.

24    And the economists are going to want to calculate that,

25    because that is one of the things that is part of the

1  damages.  And you know that by reading the WPICs or the ADA.

2       MS. SNOOK:  I do.

3       THE COURT:  So you knew it was a relevant topic to

4  begin with.

5       MS. SNOOK:  I do.  And if I was them, I would have

6  very soon after this said, "Hey, what's the answer?  Why

7  can't you produce this?"  They've just told you there's a

8  $400,000 swing.  So why not a couple weeks after this say,

9  "Hey, Don, why haven't you given this to us?"  They didn't

10 say anything in July.  They didn't say anything in August.

11      THE COURT:  How many times do you think they have to

12 ask?  Is there anything in the rules that says you have to

13 keep asking two, three, four times when you don't get

14 something?

15      MS. SNOOK:  I do think that if you have a belief that

16 someone has failed to do something in discovery, that you

17 have a limited amount of time, then, to file a motion to

18 compel.  I do think that's accurate.

19   I can tell you we had a whole bunch of topics.  We

20 resolved a big chunk of them.  And this one was the one that

21 we -- I got the answer -- I admit I did not follow up and

22 tell them what the answer was, that they could seek it

23 themselves.  And then they never brought it up again.

24      THE COURT:  Mr. Snook, the "whole lot of topics"

25 doesn't sell very well.  This is a relatively simple case in

1  the sense that we know there are known causes of action.  I

2  mean, people try cases all the time where there are hundreds,

3  thousands, millions of documents, and they manage to sort it

4  through.

5      So I come back to you.  Short of fining you $400,000 to

6  make up the swing, how do I make it right?

7          MS. SNOOK:  Well, hold on just a moment, Your Honor.

8      We'll do what you order us to do, Your Honor.  I suspect

9  the road you're going down is to allow the expert to consider

10  those benefits -- that benefit information.  And I believe

11  you will not order that we can't argue that what they're

12  trying to calculate is the wrong standard.

13          THE COURT:  Well, the problem is is you didn't give

14  them the things that they might use to follow up.  So they're

15  left trying to cobble together what they could find.  And the

16  expert may very well have come up to even a smaller

17  calculation if they had actually gotten the documents that

18  were relevant.

19      So I don't know -- normally I would exclude it because

20  it's late.  But given the behavior and the pattern of

21  behavior, it's problematic.

22          MS. SNOOK:  Your Honor, I'm concerned about the use

23  of the court's -- or the court's use of "the pattern of

24  behavior."  There has been a pattern of discovery disputes, I

25  agree with that, filed by the plaintiff.  I don't agree that

 1  there has been a pattern of negative behavior on my part,

 2  although I admit that I did not call them back and say,

 3  "We're not giving you the documents because Mr. Goldstine has

 4  access to them."  I should have done that.

 5      And to my defense, had they not liked that answer, they

 6  would have been able to do something about it.

 7      Mr. Goldstine did get the benefits information and they

 8  are listed exhibits on their exhibit list.  So I suppose the

 9  answer --

10          THE COURT:  When?

11          MS. SNOOK:  When?

12          THE COURT:  Um-hum.  When did they get them?

13          MS. SNOOK:  I don't know.  I don't think I can ask

14  that.  But they are listed as exhibits.

15          THE COURT:  You didn't give them to them?  You're

16  saying that they scrounged them up?

17          MS. SNOOK:  Yes.  They got them.  They had access to

18  them.  And they've got them.  And they're part of the record.

19  We objected to them.  But I suppose one way to resolve this

20  is for you to say that our objection to their late disclosure

21  of them is denied and they should be allowed to use them.

22          THE COURT:  Okay.  Let's go back to the order that I

23  gave you to deliver things in seven days.

24          MS. SNOOK:  Okay.  I do want to be clear on this.

25  That order has nothing to do with what we're talking about

1   now.

2          THE COURT:  Well, you just challenged me on whether

3   there's a pattern here.  So I'm going back to trying to find

4   out if any of the documents that were later turned over were

5   responsive to the order and were they late?

6          MS. SNOOK:  We took seriously obviously Your Honor's

7   order that we produce the documents within seven days.  And

8   we did.  We produced the full responses.  Your order says we

9   were to provide full and complete further responses without

10  objections, and all responsive documents to plaintiff's first

11  set of interrogatories and requests for production within

12  seven days of this order.  We did that.

13      We scrambled to get it done.  We had multiple people

14  working on it and got it done and provided the responses to

15  the plaintiff by e-mail on -- within seven days of your

16  order.  So we provided everything to them that we had.

17          THE COURT:  And nothing you provided later was

18  responsive to the first?

19          MS. SNOOK:  The only possible one -- I'm not sure

20  that I would agree -- but the only possible one was a very

21  broad interrogatory that says -- let me find it, Your Honor,

22  because I want to get the language exactly.  Here we go.

23      "If defendant FedEx Freight had any communications in any

24  form with any person regarding the matters alleged in

25  plaintiff David Goldstine's complaint, state" -- and then it

1    provides some specifics.  So that says, did anybody have any

2    conversation in any form regarding the matters alleged in

3    David Goldstine's complaint.  So that, I suppose, could be

4    the one where this document that was produced later would be

5    responsive.

6        And what we're talking about -- I guess we should talk

7    about that -- what we're talking about is the e-mail from

8    Craig Flick, who's one of our investigators, one of our

9    witnesses, where he talked -- he was recording his

10   conversation with David Hoffman, who is the clinic director

11   at U.S. Healthworks.

12       And in that conversation that Mr. Craig Flick is

13   reporting, he is talking about his conversation with

14   Mr. Hoffman.  And Mr. Hoffman denies that there had been any

15   violent outbursts or any problems by Mr. Goldstine at the

16   clinic.  We had that report previously and produced those

17   documents.  And as part of plaintiff's motion for sanctions

18   they said:  Well, this contradicts what your witness said

19   earlier.

20       And, number one, I would be thrilled if I was a party who

21   had two documents that I could impeach a witness with.  But

22   that document was produced in June.  I'm not totally

23   convinced that that would be responsive to this

24   interrogatory.  But I will tell you and promise you as an

25   officer of the court, we did not have that document in March.

1   We didn't have that document in April or May.

2       What happened was, we had took the deposition of Christy

3   Tayman.  Ms. Wong took her deposition.  And Ms. Tayman

4   brought documents with her that I had never seen.  I was

5   concerned about that.  She was obviously concerned about

6   that.  We provided them.  They copied them.  And we realized

7   there's documents out here that we don't have.  So we did --

8           THE COURT:  What do you mean "We don't have"?  Isn't

9   Ms. Tayman your employee?

10          MS. SNOOK:  I just meant there's documents that I

11  didn't have.  So, we contacted -- Jordan Wada and I had had a

12  discussion about, we need to do a keyword search of all of

13  these e-mail accounts and figure out if there are documents

14  that are responsive that we haven't gotten yet.  And --

15  because we did perform a search from all these people trying

16  to find all these documents early on, and we've produced

17  them.  But when she had documents that we had never seen

18  before, we realized there is some sort of hole, that we're

19  not getting these documents.

20      So we performed a keyword search of Goldstine.  And we

21  were able to find additional documents from Mr. Flick which

22  were contained in his safety file.  That may be the reason

23  why they weren't provided before was because he was just

24  looking in his regular correspondence file.  But as soon as

25  we got them, we provided them.

1     THE COURT:  So you keep talking about, "As soon as we

2  got them."  You always had them.

3     MS. SNOOK:  I didn't.

4     THE COURT:  I'm not talking about you, but it's your

5  corporation that has the obligation to produce them, not you

6  personally, Mr. Snook.  So if the corporation had these

7  things and did not produce them, they had them and didn't

8  produce them.

9     MS. SNOOK:  Your Honor, I would bet any corporation,

10  even much smaller than FedEx, has trillions and trillions of

11  documents.  And if the lawyer who is producing the documents

12  is not even aware that they exist and the person who has been

13  asked to search for the documents isn't aware that they

14  exist, then we can't figure out how to get them.

15     This came up as part of our meet-and-confer.  They said,

16  "We think you've got more documents."  And I said, "Okay,

17  let's do a keyword search."  They proposed that a third party

18  forensic somebody come in and download the e-mails of all of

19  these employees.  And I said, well, we have a new program, a

20  company that we're using where we can search these and get

21  better results.

22     For example, if I just search "Goldstine" on my Outlook, I

23  will get a bunch of documents, but I won't get every

24  document.  I didn't know that.  So this company came in and

25  said, we can do a keyword search and we will be able to pull

1   all the documents that perhaps these employees who are

2   searching their e-mails weren't able to produce.  And that's

3   what happened.  Craig Flick came up with these additional

4   documents and we provided them.

5       If it was designed in order to keep this from them because

6   it was contradictory, because we wanted to hide the ball, why

7   would I give them to them in June?

8           THE COURT:  Because you have to.

9           MS. SNOOK:  I agree we have to.  And I did.

10          THE COURT:  Here's what I'm finding really hard to

11  accept is you're supposed to be a sophisticated company,

12  you're big, you've got lots of people all over the country,

13  and you're telling me you didn't run a word search for

14  Goldstine, the name of the plaintiff?

15          MS. SNOOK:  We did.  We did.

16          THE COURT:  But you didn't do it until June?

17          MR. SNOOK:  No.  We did it early on.  We send out

18  litigation holds and e-mails are protected.  We go through

19  this whole process, just like everybody does.  But what I'm

20  saying is when you get to an individual employee and you say,

21  do a search, if the person does it just in their Outlook, you

22  will get a huge number of results.  But sometimes you won't

23  get everything, unless you dig in more than what just a

24  regular person is capable, which is why we had a company come

25  in and do a keyword search and we were able to locate more

1    documents and we produced them.

2         THE COURT:  All right.  Ms. Wong?

3         MS. WONG:  I'll try to make this brief, Your Honor.

4    What I have on the screen is our very first request for

5    production, our Request For Production No. 1 that we

6    propounded in September of last year.  And it clearly asks

7    for his entire personnel files from human resources or the

8    personnel department referring to Mr. Goldstine in the last

9    five years.

10        The defense in the coverage information that we were

11   seeking should have been responsive to this very first set of

12   requests for production for documents, which is also the

13   subject of this court's order.

14        And I also wanted to address -- Mr. Snook believes that

15   Mr. Goldstine found these documents online.  Mr. Goldstine

16   did not find these documents online.  He found bits and

17   pieces of coverage.  That doesn't -- that isn't even -- that

18   doesn't even fully cover the years that he worked at FedEx.

19   Once we got these, I think like two Sundays ago, we produced

20   them to Mr. Snook.  And we don't even know if this is the

21   full set.

22        Mr. Goldstine tried looking online.  He tried logging in.

23   He's no longer an employee, so he didn't have access to it.

24   And we can't find it in the public world online anywhere.

25        So not only that, we did follow up multiple times with

1   Mr. Snook asking for these documents.  He never told us and

2   it wasn't until right now even before -- it wasn't until

3   right now he actually said he had no intentions of giving it

4   to us, because I had asked him this as we were trying to

5   continue to supplement her report.

6       So we would ask that the remedy would be to allow

7   Dr. Tapia to provide testimony based on her latest report.

8       If FedEx is able to give us the coverage and the benefits

9   information today or early tomorrow, I'm more than happy to

10  send it over to our expert and have her revise the report

11  based on the information that FedEx provides.

12      And I also wanted -- because Mr. Snook just did say that

13  they are objecting to our three documents regarding benefits

14  coverage, we would also ask the court to admit these

15  documents into evidence.  And the exhibit numbers would be

16  150, 151, and 135.

17      And I also wanted to address, really quickly, the e-mail

18  that Mr. Snook was just referring to.  I believe he stated

19  that Craig Flick himself didn't know this existed or it

20  didn't come up when they searched for the term "Goldstine."

21  And you can see I underlined eight places where

22  Mr. Goldstine's name actually appears on this document.  And

23  Mr. Flick actually sent an e-mail to Christy Tayman to which

24  Christy Tayman acknowledged receipt of back in May 2017.

25      So it's a little weird that we never received this.  And

1  it not only addresses the fact that it wasn't Mr. Goldstine's

2  behavior that caused him to be allegedly banned from U.S.

3  Healthworks, but also the regional medical director,

4  Dr. Hoffman, said that the examiner performed a very thorough

5  exam.

6      They're also objecting to this document.  And they have

7  objected to allow Mr. Hoffman to testify.  And I think one of

8  the remedies we would also ask for is for this court to

9  reconsider and allow Dr. Hoffman to testify in our case in

10  chief instead of as a potential rebuttal witness.

11      I could also address the motion for sanctions at this

12  time.

13      THE COURT:  Ms. Wong, one of the things I want to

14  have you consider carefully is, it's obvious that I'm not

15  pleased with the way discovery has gone in this case, and

16  there are a lot of things that I could have done along the

17  way.

18      I'm not pleased with FedEx's attitude about, they don't

19  have to give it unless you say "Mother may I."  And I'm not

20  pleased with them assuming that you're supposed to go dig for

21  it elsewhere.  And I'm not pleased with the fact that if

22  somebody says they're going to go do something, they don't

23  get back to you.

24      You have the issue of Mr. Goldstine's cancer diagnosis,

25  which comes up very late and doesn't give the defense an

1    opportunity to explore that.  Now, the way I tried to fix

2    that is give you at least that amount of testimony.  But, in

3    fact, that could be significant depending upon what the

4    outcome of the liability is here.

5        You have a huge swing between what you supplied with your

6    expert back in May and what you supplied two weeks ago.

7    $400,000 is a big swing.  And you're telling me that your

8    expert didn't even have all the right documents or

9    potentially doesn't have all the right documents to correct

10   that or make a substitute or supplemental report.  And if

11   there's going to be a supplemental report, the defense needs

12   to have an opportunity to have an expert look at it.  They

13   decided that they weren't interested in looking at $200,000,

14   they might be interested at looking at $600,000, or they

15   should be.

16       So one of the things that I'm contemplating is declaring a

17   mistrial and setting it over for further discovery on those

18   topics, so that we can actually have a trial based on facts

19   and not based on cobbled-together documents.  So your

20   response?

21           MS. WONG:  We wouldn't want that.  We would like to

22   proceed with trial.  I guess one of the things that we can do

23   is to --

24           THE COURT:  Are you sure?  Have you talked to your

25   client about this?  You haven't.  I think that -- there's a

1   huge swing here.

2        MS. WONG:  Your Honor, can we take a five-minute

3   break?

4        THE COURT:  You can.  And I'll do the same thing with

5   the defense.  So why don't you -- I'm going to get off the

6   bench for a few minutes, then I'm going to come back and

7   we're going to explore this possibility.  Okay?

8        MS. WONG:  I have a quick question.  If we were to

9   have a new trial, when would the earliest be?

10       THE COURT:  April.

11       MS. WONG:  Okay.  Thanks.

12                  (Recess.)

13       THE COURT:  Please be seated.

14     Ms. Wong?

15       MS. WONG:  So we conferred with our client, and

16  because of his cancer and his need for surgery, there's too

17  much uncertainty.  We do not want a mistrial and have to wait

18  until April at the earliest.  So we would like to move

19  forward.

20     A couple things that we think would potentially remedy the

21  situation would be, first, to admit the three exhibits that I

22  have stated earlier.

23     The second would be, we would want descriptive testimony

24  from a 30(b)(6) witness at trial to talk about the nature of

25  the benefits and the coverage that Mr. Goldstine was afforded

1    while he was working at FedEx.

2        The third would be, we would be willing to strike the

3    calculations up to age 72 in the supplemental report.  So the

4    swing between the initial report and our supplemental report,

5    if we were to do that, would be just $30,580.  And we would

6    also ask, in light of waiving the swing of about $400,000, as

7    well as FedEx's pattern of misconduct, sanctions in the

8    amount of $100,000.

9            THE COURT:  I need more explanation about why waiting

10    until April is not appropriate.

11            MS. WONG:  Mr. Goldstine is hoping to get surgery as

12    soon as he can.  And it may potentially take him months of

13    recovery time.  So he would rather move forward with this

14    trial now, instead of waiting until, at the earliest, April

15    when he might be out for surgery.  But he might still be in

16    his months of recovery, or -- I mean, I guess the sad side

17    would be we don't know if he would make it until April.

18        So there is that possibility that he wouldn't want to

19    risk.

20            THE COURT:  Okay.

21            MS. ISOM:  Your Honor, thank you.  We don't

22    necessarily want a mistrial either.  And one of the options I

23    was thinking of is we could get them the benefits

24    information.  I could work with Mr. Wada, or we could work to

25    get the benefits information.  They may not even need a

1  witness from us to discuss that, because it's pretty much

2  laid out.  So I could work behind the scenes on that to get

3  them that information so that their expert would have an

4  opportunity to recalculate, if need be, or to test it against

5  whatever numbers she has.

6     Reality is, Mr. Goldstine only worked for us for two

7  years, so this is -- and these are ERISA-governed plans where

8  the documents, you call and say:  I want this document, and

9  you read through it and it tells you all you need to know.

10 So we can provide that information.

11    We would oppose any monetary sanctions.  This has been a

12 case where I think there's enough blame to go around.  In the

13 discovery fight, I was involved a little bit in trying to

14 help manage some of it and figure out what we needed to --

15 you know, what we needed to produce and what were they really

16 asking for.  So I think there's enough of it to go around and

17 I think we should call that a wash.

18    But we're willing to proceed -- we wouldn't object if the

19 court would declare a mistrial -- but we're willing to

20 proceed and I'm willing to do what we need to do to make it

21 right on the benefits piece.

22         THE COURT:  You really want to go to trial when the

23 swing is $400,000, potentially?

24         MS. ISOM:  Your Honor, I'm not sure --

25         THE COURT:  Where you don't have an expert witness on

1   the other side?

2          MS. ISOM:  Well, right, there's a concern there.  We

3   have a concern there that there's this $400,000 swing,

4   because $200,000 is a lot different than the $600,000 or

5   $700,000.  So we would like that opportunity -- I don't know

6   if we're in a position to ask Your Honor for a mistrial,

7   because I think it's probably what the plaintiff is going to

8   desire.  But, yes, there's all kinds of reasons for us to

9   encourage a mistrial.  And we would be fine with that.

10     But I also want the court to know that I will do what we

11  need to do to make it right on the benefits discovery if

12  we're not going to have a mistrial.

13         MS. WONG:  Your Honor, just as a point of

14  clarification, not just -- we don't want just the numbers

15  that we might potentially get from FedEx, we want an actual

16  descriptive nature of the coverage that Mr. Goldstine had

17  when he was working there.  Because it's not just economical

18  harm, it goes to his loss of peace of mind, and emotional

19  distress.  We would want a full description of the benefits

20  and the coverage he did actually receive, not just the number

21  amount.

22     And then in terms of the sanctions, I don't think -- I

23  can't tell if we've already gone to that part to address the

24  actual sanctions, so I want to make sure I don't waive that.

25         THE COURT:  Okay.  Well, go ahead and tell me what

1      you want me to know about the sanctions.

2              MS. WONG:  Yes, Your Honor.  So I think you asked to

3      know exactly what was produced after your order on

4      March 19th.  And one of the documents I've just showed was

5      the e-mail between Craig Flick and Christy Tayman in regards

6      to Dr. Hoffman.  The other documents are specifically listed

7      under Exhibit A to my declaration for sanctions.  And

8      specifically the first document was produced on June 14th.

9      The order came down March 19th, it was a conduct-of-employees

10     policy.

11         The second document is a driver manual, Lesson 4, which

12     was produced on June 14th.  And it's also in our proposed

13     exhibits as No. 76.

14         The third document would be the safety committee

15     inspection forms and safety committee meeting agenda and

16     minutes.

17         The fourth document would be a 2017 pre-shift regarding

18     education topics on fleet maintenance.  The other document

19     would be an April 2015 pre-shift regarding raising and

20     lowering trailer doors, which is also part of our exhibit.

21         And I would also like to point out that after this court's

22     order on March 19th, on the seventh day, for all of these

23     specific requests that we've made back in September, FedEx

24     specifically said that they had already produced these in

25     initial disclosures and supplemental disclosures from 2018

1    and early 2019.

2        So they actually didn't produce any of these additional

3    documents and actually affirmatively stated that they had

4    produced everything, that we had everything.  And it wasn't

5    until June, shortly before discovery cutoff, that they

6    provided all these documents to us.

7        And we just want to stress that we really do not want a

8    mistrial.  We would really like to just proceed with trial

9    now.  Thank you.

10        THE COURT:  Anything else you'd like to say?

11        MS. ISOM:  Your Honor, I believe if we get just a

12    momentary recess we would lean towards desiring a mistrial.

13    Could I have a moment?

14        THE COURT:  I thought I gave you a moment.

15        MS. ISOM:  We didn't really get a chance to talk.  I

16    think hearing everything we're hearing now, to try to

17    accomplish all this within this week, it probably makes sense

18    to have a mistrial, get the proper discovery and come back in

19    April.

20        THE COURT:  Yes, Ms. Wong.

21        MS. WONG:  Your Honor, we're asking for a compromise.

22    We're okay with them providing a witness to be able to

23    testify about the benefits and the coverage.  And we are

24    also, as a compromise, willing to waive the $400,000 swing.

25    So what we're left with is really a difference of $30,000.

1          THE COURT:  This absolutely doesn't feel right.  It

2    doesn't feel right to me that we're -- that you're being

3    asked to waive things on the fly.  It doesn't feel right that

4    we would be making up numbers without having it be tested.

5    It doesn't feel right the way FedEx has conducted its

6    response to their discovery obligations.  And so I am going

7    to declare a mistrial.

8        Now, there are things that we can do to mitigate the

9    mistrial.  If you want to go earlier, I can see about another

10   judge trying your case.  And so that might be a possibility.

11   But I want to say I'm truly sorry about the pressure

12   Mr. Goldstine is under with his diagnosis.  But I also think

13   that he probably -- we probably need to explore what that is,

14   because the one document that we have is ambiguous.

15       If he is owed benefits, we need a proper calculation.

16   Maybe it will be less.  Maybe it will be more.  But I'm not

17   happy about the fact that FedEx didn't produce these things,

18   didn't seem to know where their documents were or how to get

19   them, promised to do things and then did not get back to you

20   on it, that you had to file three different motions to

21   compel, one of which I ruled on, and that everything seems to

22   have been late.  And it seems to have been delivered with an

23   attitude that:  We're only going to give it to you if you say

24   "Mother may I."  That is not in keeping with full disclosure.

25       So I can dial it back and allow you to open up the

1    discovery on the issue of Mr. Goldstine's diagnosis.  I'm

2    going to order that there be a 30(b)(6) witness produced by

3    FedEx that will address the topics concerning the benefits.

4    That a report, a new report based upon what the 30(b)(6)

5    comes out with, from your expert, is delivered.  I'll allow

6    the defendants to take that deposition, if they wish.

7         The defendants will pay the costs to the court for the

8    cost of the jury coming in.  And the defendants will pay the

9    cost of bringing on your sanctions motions, your attorneys'

10   fees.  So you need to file an affidavit as to what your

11   attorneys' fees are for bringing that forward.

12        So is there any questions about what I've done so far?

13            MS. WONG:  No, Your Honor.

14            THE COURT:  Is there anything else you want in terms

15   of discovery?

16            MS. WONG:  We would want a ruling to allow the

17   testimony of Dr. Hoffman -- or at least not strike him at

18   this point in time -- when we try the case again, because we

19   think he's a critical witness.  And we didn't know about him

20   until they late-produced this document.

21            THE COURT:  I'll allow you to list him as a witness.

22   And if they want to take his deposition they can do so.  I'm

23   assuming they may want to follow up with Mr. Goldstine on his

24   medical issues, if they do.

25        Finally, you're all going to go to a settlement

1    conference.  And that might be your first order of business.

2         MS. ISOM:  Just one question.  Can we reserve the

3    option of potentially designating the expert, depending on

4    what we find out from their economic expert?

5         THE COURT:  I'll let you designate an expert.  But if

6    you withhold one iota of information on that --

7         MS. ISOM:  It will not happen, Your Honor, you have

8    my word.

9         THE COURT:  I started out this case thinking that

10   there was something very wrong here.  And it has been

11   perpetuated from what I see in the way that the case has been

12   worked up.  And it may very well be that I have a company

13   that wants to stonewall their information.  And I have a

14   trusting lawyer on the other side who believed you.

15        This has got to stop.  People don't have to ask multiple

16   times for things.  The rules tell you when you have to

17   respond.  They don't have to chase you for the information.

18   And so, Mr. Snook, I know you don't practice in this

19   district, but this is a district that prides itself on

20   cooperation.  And that is not what I saw out of your

21   behavior.

22        So if you're going to come back and try this case, I'm

23   going to expect that you're going to be shoving documents

24   across the table with a bow on them.

25        MS. SNOOK:  Yes, Your Honor, I promise to.

1          MS. BLOOM:  Your Honor, may we be heard on one last

2     point?

3          THE COURT:  Yes.

4          MS. BLOOM:  We just want to ask to -- on the issue of

5     monetary sanctions, we understand that we have got this --

6     we've been working exhaustively, got this trial ready to go.

7     Mr. Goldstine is ready to go.  He's got uncertainty of his

8     medical future.  And we have an apartment rented down the

9     block, nonrefundable.  We really don't think that under the

10    circumstances -- I mean, what it feels like is they engage in

11    this conduct and we're the ones that are penalized.

12        And given that, we really don't believe that a mere fee

13    award on a sanctions motion is nearly sufficient to remedy

14    the situation.  And so we would renew, again, our request for

15    sanctions, as Ms. Wong suggested $100,000.  Perhaps you

16    disagree with the amount.  But we don't think the fee

17    petition, which is maybe $15,000 --

18         THE COURT:  What I don't have -- what I have is a

19    motion for sanctions that asks for attorneys' fees.

20         MS. BLOOM:  Right.

21         THE COURT:  I granted you that.

22         MS. BLOOM:  I'm making an additional motion.

23         THE COURT:  You can make the additional motion, but

24    I'm not going to hear an additional motion without seeing

25    what the costs are.  In other words, you know, tell me what

1   they are.  And I'm going to give the other side an

2   opportunity to respond.  And I may very well increase the

3   sanctions, if that's appropriate.  But what I have in front

4   of me is just the request for sanctions.  I don't have any

5   request for sanctions based upon the mistrial.

6       Okay?

7           MS. BLOOM:  Understood.  Thank you.

8           THE COURT:  All right.  We'll give you a date in

9   April.  And if you wish to -- what I do want you to do is

10  meet and confer to set up a timetable for how you're going to

11  accomplish what it is I've asked you to accomplish.  I'll

12  sign off on it.  There are no side deals.  There are no

13  extensions unless I sign off on it.  Okay?

14      Now, you may want to have Mr. Goldstine consult with his

15  doctor and find out when his surgery is going to be.  And we

16  will do everything to work around it, including I'll see

17  about getting another judge to step in to try it if that

18  becomes necessary.  But you need to -- I don't think you have

19  all the information to know what will happen yet.

20          MS. BLOOM:  One point of clarification.  In order to

21  avoid being further penalized by the defense taking the

22  position that you've now reopened discovery and it's a

23  free-for-all and we have to respond to all, I want to be

24  clear --

25          THE COURT:  It's not a free-for-all.

1          MS. BLOOM:  Thank you.

2          THE COURT:  It's not a free-for-all.  I gave you very

3    limited things to do.  So we're not going back and forth with

4    other discovery.  You can do exactly what I said you can do,

5    which is 30(b)(6), you get the information that you

6    requested, you have your expert evaluate it.  The expert, at

7    their expense, gets deposed.  And there was one other thing.

8          MS. BLOOM:  There were a number of things.  We could

9    provide a proposed order if you'd like.

10          THE COURT:  No.  I'll write my own.

11          MS. ISOM:  Your Honor mentioned a settlement

12    conference.

13          THE COURT:  Yes.  You have to have a settlement

14    conference at the defendant's expense.  You can work on who

15    to pick, mutually.  And if you can't decide, I'll pick

16    somebody.  Or you can use one of the Rule 37 folks off the

17    list.

18      Okay.  Any other questions?

19          MS. ISOM:  Just point of clarification.  I think you

20    have notes about the discovery.  Are we to submit it?

21    Because I think you said we could potentially take

22    Mr. Goldstine's deposition.

23          THE COURT:  We'll write an order.  I have the

24    realtime.  And Mr. Crozier will go back and I'll work on

25    getting you an order right away.  But I do want you to meet

1   and confer on what the timetable is for these things to

2   happen.  So to get you ready to go, if you want to do an

3   accelerated trial, you need to let me know and I'll try and

4   find another judge, perhaps out of district, to do it.  Okay?

5   All right.  Do you want to be here when I dismiss the jurors?

6   I don't think it's a good idea.

7          (The following occurred in the presence of the jury.)

8          THE COURT:  Good morning, ladies and gentlemen.  I

9   have some fairly sad news from the standpoint of being a

10  judge.  I've declared a mistrial in this case due to the

11  conduct of the development of the case along the way.  It has

12  nothing to do with you, but it does mean that we are going to

13  start over.  So there will be a new jury that's selected and

14  we will move forward.

15      I really thank you for your time to come in and I

16  appreciate your service.  These things happen sometimes.  And

17  I just considered it the best way to be fair to all parties

18  was to have that happen.  So I'm very sorry.  I'm sorry we

19  kept you waiting.  But I had to do my job, which is rule on

20  the law.  Your job is to find the facts.

21      So, do any of you have any questions for me?

22          A JUROR:  Will we be given something for our

23  employers?

24          THE CLERK:  Yes, Your Honor.  Just check out in the

25  jury room, they'll have attendance slips.

 1          THE COURT:  Okay.  Anything else?  Yes?

 2          A JUROR:  Your Honor, would you like to explain to us

 3  the significance of the art?

 4          THE COURT:  Yes.  Yes.  Well, first of all, what did

 5  you see when you went down to the first floor?

 6          A JUROR:  A group of people that looked like us.

 7          THE COURT:  Yes, exactly.  People that looked just

 8  like you.  In some ways a lot like you.  So one of the things

 9  I think the artist is trying to do is to celebrate you, the

10  jury, who come to this courthouse.  And that mural is

11  actually three levels, three stories tall.

12      So can anybody tell me -- all of those people are real

13  people, by the way.  They all live here in the Western

14  District of Washington and they all do the jobs or did the

15  jobs when the painting was made that you see them in.  And so

16  I think we're also trying to capture the breadth and

17  diversity of who is here in our district.

18      How do you think the artist made it?

19          A JUROR:  It's on wood.

20          THE COURT:  It's on wood.  Do you think he took a

21  paintbrush?

22          A JUROR:  I don't know.  No.

23          A JUROR:  It looks like photographs.

24          THE COURT:  It's almost like photographs, isn't it?

25  You know, very, very small pixels.  It's spray paint and

1  stencils.  Every color that you see there was a stencil made,

2  then they spray paint, based upon a picture.  So it's kind of

3  like our own tagging wall.  Cans of spray paint are what made

4  that picture.

5      If you go out to the airport in the original Alaska

6  Airlines concourse, I think it's probably C, you'll see the

7  artist.  And there he had a picture of a magician and lady in

8  a box.  That's the same artist.

9          A JUROR:  What is the artist's name?

10         THE COURT:  You know, if you hadn't asked me I could

11 have told you.  There's a poster in the jury room that will

12 give you the information.

13     So just to carry through, before you leave you might want

14 to go take a look at the other two floors, because what

15 you're going to see on the next floor up is a bunch of

16 chairs, and the chairs are big, small, one is backwards, you

17 know, one is made of bricks, one is kind of wispy.  And I

18 interpret that that the artist is trying to tell us that

19 everybody comes with different attitudes and points of view.

20 Some people are stubborn.  Some people are ethereal.  Some

21 people are rigid in their point of view.  Some people are

22 bigger than life.  Some people think of themselves as small.

23     But then you go up to the third floor and what you're

24 going to see is all of those same people that are on the

25 first floor, and now they're all life-size.  They're not

1   bigger than life, they're life-size.  And they are all

2   sitting in chairs.  They're all the same size.  It is in

3   black and white.  And everyone is faced forward.  And what I

4   interpret the artist to be saying to us is, you come in as

5   individuals with your different ideas, but then you come and

6   form a jury where you have a common purpose, and everyone's

7   attitude and everyone's voice is the same size.  And that you

8   are all faced forward because you have a job to do.  And you

9   become a unit that works together.

10       So if you look at the grain in the wood, downstairs on the

11   first floor with all the colorful people coming in, the wood

12   is up and down, indicating to me that you all come in as

13   individuals.  On the second floor the wood is -- sometimes is

14   crossed, sometimes it's down.  It's varied.  Further

15   emphasizing that people come in with varied points of view.

16   But when you go up to the third floor, the grain is all

17   horizontal, meaning that you are all together on the same

18   level.

19       So that's my interpretation of the art.  I'm sorry you

20   didn't get a chance to go to the full class and I gave you

21   the summary version here.  But it really was designed, and

22   the judges here worked with the artist to conceptualize the

23   idea of being welcoming to jurors to come in and do their job

24   and be part of their government.

25       So I think the building reflects exactly what it is that

1    you as jurors should do.  There's a lot of other great art in

2    the building.  You may want to take a look at some of the

3    other art before we leave.

4        Anything else I can help you with?

5            A JUROR:  So are we completely dismissed?

6            THE COURT:  You're completely dismissed.  We call

7    people in, unlike other jurisdictions, you were called in for

8    a specific case.  So thank you for your service.  I hope you

9    will get a chance to serve again one day.  Most people who

10   serve find it a really enjoyable experience, at least from

11   our surveying of them.  Okay?  Anything else?

12           A JUROR:  The green chair that someone sits on in the

13   mural is just like the green chair that I sit on at work.  I

14   took a picture of it.

15           THE COURT:  All right.  Well, see, it is people just

16   like you.

17           A JUROR:  It's my pocket art.

18           THE COURT:  Okay.  There you go.  Very good.  Thank

19   you.

20                          (Adjourned.)

21

22

23

24

25

1          C E R T I F I C A T E

2

3

4      I certify that the foregoing is a correct transcript from

5   the record of proceedings in the above-entitled matter.

6

7

8

9   */s/ Debbie Zurn*

10  DEBBIE ZURN
    COURT REPORTER

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25