1

2

3

4

5

6

7

8             UNITED STATES DISTRICT COURT
          WESTERN DISTRICT OF WASHINGTON
9                    AT SEATTLE

10    DAVID GOLDSTINE,                    CASE NO. C18-1164 MJP

11                    Plaintiff,          ORDER DENYING RULE 50 AND
                                          RULE 59 POST-TRIAL MOTIONS
12          v.                            AND CONCLUDING PLAINTIFF'S
                                          ADA RETALIATION CLAIM IS
13    FEDEX FREIGHT INC,                  MOOT

14                    Defendant.

15

16          This matter comes before the Court on Plaintiff's Motion for Judgment as a Matter of

17   Law and Equitable Relief (Dkt. No. 358) and Defendant's Motion for Judgment as a Matter of

18   Law, or in the Alternative, a New Trial or Remittitur (Dkt. No. 350). Having reviewed the

19   Motions, the Oppositions (Dkt. Nos. 374, 381), the Replies (Dkt. Nos. 385, 397), the Surreplies

20   (Dkt. Nos. 390, 401), and all relevant portions of the record, the Court DENIES both Motions.

21   The Court also finds and concludes that Plaintiff's ADA retaliation claim is MOOT.

22

23

24

**BACKGROUND**

After eight days of trial, an eight-person jury returned a verdict on November 16, 2020 in favor of Plaintiff David Goldstine's claims for: (1) disability discrimination in violation of the Washington Law Against Discrimination (WLAD); (2) retaliation in violation of WLAD: (3) disability discrimination in violation of the Americans with Disabilities Act (ADA); and (4) retaliation in violation of the ADA (an advisory verdict only). (See Dkt. No. 326.) The jury also agreed with Defendant FedEx Freight, Inc.'s affirmative defense that Goldstine failed to mitigate his damages. (Id.) The jury awarded Goldstine $129,278 for past economic losses, $272,465 for future economic losses, and $1,750,000 for emotional damages. (Id.) The jury also determined that Goldstine failed to mitigate his damages in the amount of $300,000. (Id.) And as to Goldstine's ADA discrimination claim, the jury awarded Goldstine $5,000,000 in punitive damages for acting with malice or reckless indifference. (Id.)

During trial, both Parties moved for judgment as a matter of law. (See Dkt. No. 308, 312, 317.) The Court denied both motions on the record in open court. The Parties now renew those motions and seek additional relief, as described and analyzed below.

**ANALYSIS**

**A.     Legal Standards**

Under Rule 50 a party may renew a motion of for judgment as a matter law that was not granted by the Court. Such a motion should be granted only "if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." Pavao v. Pagay, 307 F.3d 915, 918 (9th Cir. 2002). "In considering a Rule 50(b)(3) motion for judgment as a matter of law, the district court must uphold the jury's award if there was any 'legally sufficient basis' to support it." Experience

1  Hendrix L.L.C. v. Hendrixlicensing.com Ltd, 762 F.3d 829, 842 (9th Cir. 2014) (quoting Costa

2  v. Desert Palace, Inc., 299 F.3d 838, 859 (9th Cir. 2002)). "In making that determination, the

3  district court considers all of the evidence in the record, drawing all reasonable inferences in

4  favor of the nonmoving party" and "the court may not make any credibility determinations or

5  reweigh the evidence." Id. (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150

6  (2000)).

7         Under Rule 59 "[t]he court may, on motion, grant a new trial on all or some of the issues .

8  . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action

9  at law in federal court." Fed. R. Civ. P. 59(a)(1). "Rule 59 does not specify the grounds on which

10  a motion for a new trial may be granted," so the Court is instead "bound by those grounds that

11  have been historically recognized." Zhang v. Am. Gem Seafoods, Inc., 339 F.3d 1020, 1035 (9th

12  Cir. 2003). "Historically recognized grounds include, but are not limited to, claims 'that the

13  verdict is against the weight of the evidence, that the damages are excessive, or that, for other

14  reasons, the trial was not fair to the party moving.'" Molski v. M.J. Cable, Inc., 481 F.3d 724,

15  729 (9th Cir. 2007) (quoting Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 251 (1940)).

16  "The trial court may grant a new trial only if the verdict is contrary to the clear weight of the

17  evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice."

18  Passantino v. Johnson & Johnson Consumer Prods., Inc., 212 F.3d 493, 510 n.15 (9th Cir. 2000).

19  "Unlike with a Rule 50 determination, the district court, in considering a Rule 59 motion for new

20  trial, is not required to view the trial evidence in the light most favorable to the verdict."

21  Experience Hendrix, 762 F.3d at 842. "[T]he district court can weigh the evidence and assess the

22  credibility of the witnesses" and "may sua sponte raise its own concerns about the damages

23  verdict." Id. (citation omitted). "Ultimately, the district court can grant a new trial under Rule 59

24

1  on any ground necessary to prevent a miscarriage of justice." Id. (citing Murphy v. City of Long

2  Beach, 914 F.2d 183, 187 (9th Cir. 1990)).

3  **B.    Plaintiff's Motion**

4       Goldstine asks the Court to enter judgment as a matter of law in his favor and set aside

5  the jury's determination that he failed to mitigate his damages. And for the first time in this case

6  Goldstine asks the Court to enter an injunction against FedEx. Neither argument has merit.

7       **1.    The Evidence Supported the Jury's Mitigation Award**

8       Goldstine argues that the evidence cannot support the jury's conclusion that he could

9  have mitigated his damages by $300,000. The Court disagrees.

10      At trial, FedEx bore the burden of establishing that Goldstine was not reasonably diligent

11  in seeking substantially equivalent employment and that with reasonable diligence he could have

12  obtained such employment. Sangster v. United Air Lines, Inc., 633 F.2d 864, 868 (9th Cir.

13  1980), cert. denied, 451 U.S. 971 (1981). "[S]ubstantially equivalent" employment requires

14  "virtually identical promotional opportunities, compensation, job responsibilities, working

15  conditions, and status as Plaintiff's [former] position." Hughes v. Mayoral, 721 F. Supp. 2d 947,

16  968 (D. Haw. 2010). And FedEx bore the burden of demonstrating the existence of substantially

17  equivalent jobs at the time Plaintiff was searching for employment. EEOC v. Farmer Bros. Co.,

18  31 F.3d 891, 906 (9th Cir. 1994).

19      The jury heard testimony and saw documentary evidence that FedEx had offered

20  Goldstine his job back by the end of July 2017. There was thus evidence of "substantially

21  equivalent" employment. See Hughes, 721 F. Supp. 2d at 968. The jury also heard Goldstine's

22  deposition testimony from April 2019 that he "probably" would have returned to FedEx had he

23  known of the possibility. (See Dkt. No. 382 at 36.) While Goldstine qualified that remark, his

24

1   statement further supports the jury's determination that he could have returned to work at FedEx.

2   And while Goldstine presented evidence and testimony that he did not want to return to FedEx,

3   the jury was still entitled to conclude that he could have and that failing to do so was not

4   reasonably diligent. <u>See</u> <u>Sangster</u>, 633 F.2d at 868. In addition, the jury was presented with a

5   detailed table of damage calculations prepared by Dr. Christina Tapia from which it could have

6   determined the exact amount of damages Goldstine could have mitigated. In light of the evidence

7   presented at trial, the Court finds no basis to set aside the jury's determination as to the

8   mitigation award.

9        Goldstine's contrary argument relies on assumptions about what the jury believed and

10   how it calculated the mitigation amount. Goldstine first presumes that if the jury adopted Dr.

11   Tapia's front and back pay analysis (which appears is likely), it should have also adopted Dr.

12   Tapia's calculation of damages if it believed he should have returned to FedEx in July 2017. He

13   then assumes that because the jury did not use that precise figure, it must have believed he

14   should have found work outside of FedEx. Based on these assumptions, Goldstine then

15   concludes that the jury's verdict is contrary to the evidence because FedEx failed to provide

16   sufficient evidence of substantially equivalent jobs outside of FedEx. But Goldstine's string of

17   speculations do not show that "the evidence, construed in the light most favorable to the

18   nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the

19   jury's verdict." <u>Pavao</u>, 307 F.3d at 918. That the jury did not adopt Dr. Tapia's specific figure

20   does not show that the award was unsupported by the evidence. The jury was free to reach its

21   own conclusion as to the specific amount based on the evidence before it. The Court rejects

22   Goldstine's invitation to make unreasonable conclusions premised on speculation and innuendo.

23   The Court DENIES the Motion as to this issue.

24

1          **2.      Goldstine's Request for an Injunction**

2          More than two years after filing his lawsuit and a month after trial concluded, Goldstine

3   now asks the Court to issue a broad injunction against FedEx as relief for his ADA retaliation

4   claim as follows:

5          FedEx Freight is directed to take affirmative steps to improve communication between its
           national Safety Department, the company's local management, and the DOT medical
6          examiners who certify its drivers, to avoid future occurrences of disability discrimination
           when determining employee medical qualification under Federal Motor Carrier Safety
7          Administration standards.

8   (Dkt. No. 358 at 12.) The Court finds no basis to grant this request.

9          A party seeking a permanent injunction must demonstrate: "(1) that it has suffered an

10  irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate

11  to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff

12  and defendant, a remedy in equity is warranted; and (4) that the public interest would not be

13  disserved by a permanent injunction." eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391

14  (2006). FedEx presents four valid arguments in opposition to this request.

15         First, FedEx argues that because Goldstine never pleaded a specific claim for injunctive

16  relief he cannot do so for the first time through a post-trial motion. The Court agrees. See Pac.

17  Radiation Oncology, LLC v. Queen's Med. Ctr., 810 F.3d 631, 633 (9th Cir. 2015) ("When a

18  plaintiff seeks injunctive relief based on claims not pled in the complaint, the court does not have

19  the authority to issue an injunction."). While Goldstine's trial brief spoke of equitable remedies,

20  he never mentioned an injunction. (Dkt. No. 281 at 12-13.) At best Goldstine's amended

21  complaint included a catchall prayer "[f]or such other and further relief as the court deems just

22  and equitable." (Second Am. Compl. Prayer for Relief E (Dkt. No. 17 at 14).) But the mere

23  invocation of the Court's equitable powers hardly put FedEx on notice that he wanted any

24

1    injunction let alone the one he proposes. This is an independent basis on which the Court denies

2    the request.

3         Second, FedEx argues that because Goldstine elected to pursue monetary rather than

4    equitable relief, the Court should not award anything further. This follows the general principal

5    that courts "equity will grant no relief where an adequate remedy at law exists." Mort v. United

6    States, 86 F.3d 890, 892-93 (9th Cir. 1996) (citation and quotation omitted). Goldstine admits as

7    much in his proposed findings of fact and conclusions of law, stating that he waived his right to

8    have the Court invoke its equitable powers to award him front pay or reinstatement. (See Pl.

9    Proposed Findings of Fact and Conclusions of Law (Dkt. No. 394 at 16) (citing Teutscher v.

10   Woodson, 835 F.3d 936, 956 (9th Cir. 2016).) Given that Goldstine received substantial

11   monetary relief, the Court cannot conclude that he did not obtain an adequate legal remedy for

12   his injuries even considering the jury's mitigation award. See eBay, 547 U.S. at 391. This is

13   another independent reason on which the Court denies the injunction.

14        Third, Goldstine has failed to identify what irreparable harm he faces without entry of the

15   injunction or how the proposed injunction would redress any harm he has suffered. This alone

16   justifies its denial. For the first time in his reply Goldstine argues that the "[h]arm from FXF's

17   actions and denial of front pay is irreparable unless the Court reinstates the economic loss award

18   or orders him reinstated." (Reply at 7 (Dkt. No. 397).) But this argument is flawed. First,

19   Goldstine admitted he waived a right to seek an equitable remedy for front pay. (See Dkt. No.

20   394 at 16.) Second, Goldstine does not and cannot show how the proposed injunction would

21   redress this purported "harm." Goldstine's failure to show irreparable harm is an independent

22   basis to deny the injunction.

23

24

1    Fourth, Goldstine fails to identify any evidence he adduced at trial that might justify what

2    appears to be a nationwide injunction. Though the Goldstine presented troubling evidence about

3    misconduct, he nowhere developed or presented evidence of similar acts taken against anyone

4    other than him that might justify the requested relief. And the proposed injunction fails to present

5    a cogent and enforceable standard. As phrased, it would direct FedEx to "take affirmative steps

6    to improve communication." This is both vague and unenforceable, and an independent basis on

7    which the Court denies the injunction.

8        **3.      Request to Strike**

9    FedEx's surreply asks the Court to strike certain "misstatements of law and new

10   arguments not contained in his original motion." (Dkt. No. 401 at 1.) FedEx's request to strike

11   "misstatements of law" is simply an attempt to provide further responsive briefing. This is not

12   proper or permitted under the Local Rules. But the Court agrees with FedEx that Goldstine's

13   request for further discovery and briefing was improperly raised for the first time on reply. And,

14   on its merit, Goldstine is not entitled to further discovery on an issue he failed to raise at any

15   point before the conclusion of trial. The Court STRIKES this argument/request and has not

16   considered it.

17       **4.      Attorneys' Fees**

18   Goldstine asks the Court to award him nearly $24,000 in attorneys' fees for bringing the

19   motion. The Court may award fees to the prevailing party "only for work related to issues on

20   which they prevail." Lambert v. Ackerley, 180 F.3d 997, 1012 (9th Cir. 1999). The Court

21   declines to award fees for this Motion. The Motion failed to advance a tenable argument that

22   might support entry of judgment as a matter of law or issuance of an injunction. The hours spent

23

24

1   drafting the motion were not reasonably spent and Goldstine did not prevail on this issue. The

2   Court DENIES the request.

3   **C.      ADA Retaliation Claim**

4          Pending before the Court is Goldstine's equitable ADA retaliation claim. The Court

5   makes the following ruling having held an 8-day trial, and having reviewed Plaintiff's Motion

6   for Judgment as a Matter of Law, Goldstine's Supplemental Trial Brief, and Goldstine's

7   Proposed Findings of Fact and Conclusions of Law. Because Goldstine does not seek any

8   equitable relief that the Court can or should grant there is no longer a present controversy for

9   which effective relief can be granted and the Court finds Goldstine's ADA retaliation claim

10  MOOT. See Bayer v. Neiman Marcus Grp., Inc., 861 F.3d 853, 862 (9th Cir. 2017) ("The basic

11  question in determining mootness is whether there is a present controversy as to which effective

12  relief can be granted." (citation and quotation omitted)).

13         Under the ADA, the Court has broad equitable powers, which include "reinstatement or

14  hiring of employees, with or without back pay," and "any other equitable relief as the court deems

15  appropriate." 42 U.S.C. § 12117(a); 42 U.S.C. § 2000e-5(g)(1). Goldstine has failed to identify any

16  equitable remedy to which he is entitled, particularly in light of the jury's award.

17         First, Goldstine admits he abandoned any right to reinstatement or front pay by submitting

18  his damages requests to the jury. In his proposed findings of fact and conclusions of law, Goldstine

19  states:

20         In this case, all liability and damages issues were decided by the jury, including front pay,
           which precludes front pay as an equitable remedy. Teutscher v. Woodson, 835 F.3d 936, 956
21         (9th Cir. 2016) (Plaintiff "waived his right to a reinstatement award when he affirmatively
           elected to seek front pay from the jury.").

22  (Dkt. No. 394 at 16.) Having submitted his request to the jury to determine back and front pay,

23  Goldstine waived any right to reinstatement. See Teutscher, 835 F.3d at 955-56. Nor has Plaintiff

24

ORDER DENYING RULE 50 AND RULE 59 POST-TRIAL MOTIONS AND CONCLUDING PLAINTIFF'S
ADA RETALIATION CLAIM IS MOOT - 9

1  identified any exception to this rule where the jury's mitigation award may have the practical

2  effect of diminishing some amount of the front pay. And Goldstine's suggestion that the Court

3  use its equitable power to set aside the mitigation award would run contrary to the instruction of

4  <u>Teutscher</u> that the Court's equitable powers do not give the plaintiff "a second bite at the apple

5  by seeking a duplicative reinstatement award from the court." <u>Id.</u> at 956.

6       Second, Goldstine fails to persuade the Court that there is any valid injunctive relief to

7  which he is entitled. As explained in Section B(2), this request fails for multiple reasons. Nor has

8  Goldstine convinced the Court that his request for "injunctive relief directing FXF to take

9  affirmative steps to avoid future occurrences of disability discrimination" is appropriate. (Dkt. No.

10 358 at 2.) Goldstine, who is not employed by FedEx, has not showed what irreparable harm he

11 faces without entry of this injunction. <u>See</u> <u>eBay</u>, 547 U.S. at 391. The Court finds no basis on

12 which to enter an injunction in Goldstine's favor, particularly in light of the substantial monetary

13 award Goldstine received from the jury's verdict.

14      Third, the Court is not convinced by Goldstine's boilerplate argument that it should award

15 "further equitable relief under the ADA to secure complete justice." (Dkt. No. 394 at 16.)

16 Goldstine does not identify what specific relief this is, and the Court has not sua sponte identified

17 any such relief.

18      The Court finds that there is no equitable relief to which Goldstine is entitled given his

19 own litigation choices and the jury's significant monetary award. The Court further finds that

20 there no longer exists a present controversy between the parties as to which equitable relief can

21 or should be granted and finds the ADA retaliation claim MOOT. <u>See</u> <u>Bayer</u>, 861 F.3d at 862.

22 This constitutes the Court's findings of fact and conclusions of law on this claim, as required by

23 Rule 52(a)(1).

24

1  **D.     FedEx's Motion**

2      FedEx's Motion raises five distinct issues. First, FedEx renews its Motion for Judgment

3  as a Matter of Law. Second, FedEx seeks remittitur of the jury's noneconomic and punitive

4  damages award. Third, FedEx asks for a new trial based on what it believes were improper jury

5  instructions. Fourth, FedEx also seeks a new trial because of allegedly improper evidentiary

6  rulings. Fifth, FedEx renews its objections to the remote jury trial. The Court finds no merit to

7  any of these arguments.

8          **1.     Renewed Motion for Judgment as a Matter of Law**

9      FedEx seeks judgment as a matter of law on four issues. First, FedEx argues that

10  Goldstine failed to provide evidence that he was disabled, perceived/regarded as disabled, and/or

11  had a record of disability. Second, FedEx contends that Goldstine has not shown FedEx

12  discriminated against him by decertifying him or refusing to reinstate him. Third, FedEx

13  contends that Goldstine failed to show "but for" causation. Fourth, FedEx argues that the

14  evidence was insufficient to allow the jury to consider punitive damages.

15          **a.     Goldstine's disability, the perception, and/or record thereof**

16      FedEx argues that Goldstine failed to provide evidence he is disabled, was

17  regarded/perceived as disabled or had a record of disability. The Court disagrees.

18      Under the WLAD "disability" is defined as "a sensory, mental, or physical impairment

19  that: (i) [i]s medically cognizable or diagnosable; or (ii) [e]xists as a record or history; or (iii) [i]s

20  perceived to exist whether or not it exists in fact." RCW 49.60.040(7)(a). "A disability exists

21  whether it is temporary or permanent, common or uncommon, mitigated or unmitigated, or

22  whether or not it limits the ability to work generally or work at a particular job or whether or not

23  it limits any other activity within the scope of this chapter." RCW 49.60.040(7)(b).

24

1    Under the ADA, a "disability" is defined as: (A) a physical or mental impairment that

2    substantially limits one or more of the major life activities of such individual; (B) a record of

3    such an impairment; or (C) being regarded as having such an impairment. 42 U.S.C. §12102(2).

4    An individual has a record of a disability if the individual has "a history of, or has been

5    misclassified as having, a mental or physical impairment that substantially limits one or more

6    major life activities." 29 C.F.R. § 1630.2(k).  An individual is "regarded as" having a disability if

7    he establishes that he has been discriminated against "because of an actual or perceived

8    impairment whether or not the impairment limits or is perceived to limit a major life activity." 42

9    U.S.C. § 12102(3)(A). And while a plaintiff cannot be "regarded as" having a disability if the

10   actual or perceived impairment is "transitory and minor"—i.e., six months or less—42 U.S.C. §

11   12102(3)(B), this exception is an affirmative defense for which the employer bears the burden

12   proof. Nunies v. HIE Holdings, Inc., 908 F.3d 428, 435 (9th Cir. 2018).

13   Relying solely on testimony from PA-C Jon Feldheger, FedEx argues that because

14   Goldstine had a "full range of motion" during an examination he was not disabled. (Def. Mot. at

15   2 (Dkt. No. 350 at 3).) But as Goldstine points out, there was evidence that he was disabled

16   based on the prior injury to his knee and the post-surgery limitations on the use of his knee,

17   including a limited range of motion. And while Feldheger found full range of motion at one visit,

18   the jury heard other evidence about limitations on Goldstine's range of motion, suggesting that

19   the limitations could have been episodic. The Court finds sufficient evidence for the jury to have

20   found Goldstine disabled under the ADA.

21   Even if the record did not support such a finding, Goldstine provided ample evidence and

22   testimony that FedEx perceived/regarded him as disabled. The entire genesis of his

23   decertification was the belief that he was not able to perform his work due to his knee

24

1   limitations. For example, in an April 11, 2017 email that led to Goldstine's decertification, Field

2   Safety Advisor Ted Carlson wrote: "Driver states he has a disability and can't open or close

3   trailer doors." There was further evidence presented at trial that FedEx believed Goldstine was

4   disabled even though Goldstine maintained that he could perform the job. This evidence is also

5   sufficient to support a determination that Goldstine had a record of being disabled and was being

6   misclassified. No grounds justify entry of judgment as a matter of law for FedEx.

7           **b.      Reasons for decertification and refusal to recertify**

8           FedEx retreads its argument that Goldstine was decertified purely for safety reasons and

9   that his disability or the perception thereof was not a substantial factor in or the "but for" cause

10  of the decision to decertify him. (Def. Mot. at 5 (Dkt. No. 308).) This argument did not persuade

11  the jury, which heard substantial testimony about Goldstine's decertification resulting from

12  FedEx's belief that he was disabled or his actual disability. The jury also heard evidence

13  suggesting that FedEx rejected his April 13, 2017 DOT certification because he had not

14  adequately disclosed what FedEx believed was a disability. FedEx has not shown any valid

15  grounds to overturn the jury's verdict on this issue.

16          FedEx also claims that Tammy Rogers, a Safety Advisor, decertified Goldstine purely for

17  safety reasons and was not influenced by anyone else at FedEx. But as FedEx's Motion admits,

18  Rogers acted on Carlson's email describing Goldstine as being disabled, which itself was based

19  on information Carlson obtained from Goldstine's manager, Dave Appesland, through Christy

20  Tayman, the Employee Relations Advisor (i.e., human resources). (Def. Mot. at 5 (Dkt. No.

21  350); see also Dkt. No. 308 at 2.) Rogers' actions were based on the perception that Goldstine

22  was incapable of doing the job fully due to a disability. The jury heard testimony that Carlson

23  acted on information from Goldstine's direct manager, Dave Appesland, who perceived

24

ORDER DENYING RULE 50 AND RULE 59 POST-TRIAL MOTIONS AND CONCLUDING PLAINTIFF'S
ADA RETALIATION CLAIM IS MOOT - 13

1    Goldstine as disabled and felt "legally threatened" by Goldstine when he complained about the

2    trailer door incident as related to a disability. There was evidence to support the jury's

3    determination that Rogers' decision was based on a retaliatory animus directed at Goldstine for

4    refusing to drive a truck with a broken trailer door due to his knee limitation or the perception

5    that he was disabled. And there was evidence that Tayman failed to relay pertinent information

6    to Rogers to inform her decision about returning Goldstine to work. FedEx was allowed to

7    present its view that all acts were undertaken for safety reasons, but the jury was not convinced.

8    There is no basis to set aside the jury's determination.

9                    **c.      Causation**

10           FedEx argues that because Goldstine failed to disclose his knee limitations on the April

11   13, 2017 DOT certification, Rogers' rejection of the certification was necessary and required by

12   Federal Motor Carrier Safety Administration regulations. This argument tries yet again to

13   interject a business necessity defense that FedEx failed to plead. FedEx's renewed effort is not

14   well taken. Moreover, the jury heard evidence that Goldstine was decertified because of Roger's

15   perception that he was disabled—a perception based on statements from Goldstine's manager

16   and others in the chain of communication that built up this perception. The jury also heard

17   testimony from Dr. Hoffman and Feldheger that the April certification was valid and that

18   Goldstine was capable of working safely. The jury's verdict on this issue is not contrary to the

19   evidence. FedEx also argues that because Goldstine was offered the job back on July 25, 2017 "it

20   was Goldstine's conduct, not FXF's, that ended his employment." (Mot. at 6 (Dkt. No. 350 at

21   7).) The jury heard ample evidence to the contrary. And even though it determined that Goldstine

22   should have mitigated his damages, that does not lead to the conclusion that there was an

23

24

1    absence of causation between the discrimination and Goldstine's termination. If that were true, it

2    would not have awarded him any damages. The Court finds no basis to set aside the verdict.

3                    d.    **Punitive damages**

4          FedEx argues that punitive damages were not warranted because there was an absence of

5    malice or reckless indifference to Goldstine's federally-protected rights. (Def. Mot. at 6 (Dkt.

6    No. 350 at 8).) FedEx claims Plaintiff "submitted no proof that FXF intentionally 'engaged in a

7    discriminatory practice or discriminatory practices with malice or with reckless indifference to

8    the federally protected rights of an aggrieved individual' as he must do in order to recover

9    punitive damages under the ADA." (Id. at 9 (citing  42 U.S.C. § 1981a(a)(2), (b)(1); Kolstad v.

10   Am. Dental Ass'n, 527 U.S. 526, 535 (1999).) The Court disagrees.

11         Punitive damages "apply in intentional discrimination cases where the plaintiff can show

12   that the employer knowingly or recklessly acted in violation of federal law." Hemmings v.

13   Tidyman's, Inc., 285 F.3d 1174, 1197 (9th Cir. 2002) (citing Kolstad, 527 U.S. at 535). "[I]n

14   general, intentional discrimination is enough to establish punitive damages liability." Passantino,

15   212 F.3d at 515. "[M]alice and reckless indifference are subjective questions concerning the

16   employer's motive or intent, rather than an objective inquiry into whether the employer's

17   behavior is 'egregious.'" Hemmings, 285 F.3d at 1197 (quoting Kolstad, 527 U.S. at 535-38).

18   "The defendant is appropriately subject to punitive damages if it acts 'in the face of a perceived

19   risk that its actions will violate federal law.'" Hemmings, 285 F.3d at 1197 (quoting Kolstad, 527

20   U.S. at 536). And "the plaintiff must show that the intentional discrimination by an employee is

21   attributable to the employer by using traditional agency principles, e.g., that a managerial

22   employee acted within the scope of his or her employment." Id. (citing Kolstad, 527 U.S. at 540-

23

24

1   41). But "a sufficiently senior agent may be treated as the corporation's proxy." Id. at 1198

2   (citing Passantino, 212 F.3d at 516).

3       FedEx fails to show any basis to set aside the jury's punitive damages award. First, there

4   was evidence that FedEx acted in the face of a perceived risk that its actions would violate

5   federal law. See Hemmings, 285 F.3d at 1197. Goldstine testified that FedEx used his refusal to

6   close a broken trailer door—an act the jury could have found outside of his job duties—to

7   discriminate against him on account of a perceived disability. The jury heard evidence that

8   FedEx has an anti-discrimination policy that require investigation of claims of disability and that

9   instead of following it, FedEx decertified Goldstine from driving because of a perceived

10  disability. FedEx also accused Goldstine of falsifying the DOT certification application by not

11  disclosing a knee limitation that FedEx perceived to be a disability, but which Goldstine

12  explained did not impact his ability to work. The jury heard evidence of an animus directed at

13  him by his manager, Appesland, who also testified that he felt legally threatened by Goldstine.

14  From this, the jury could have concluded he was aware that the decertification could violate

15  Goldstine's rights. And the jury heard evidence that Rogers' based her decision to decertify

16  Goldstine on the perception of his disability and the animus against him held by many others at

17  FedEx, including, but not limited to Appesland, Tayman, and Mott. The jury also heard

18  testimony that after Goldstine filed his charges of discrimination with the State, Tayman was

19  simply counting the days that needed to elapse before she could fire him. This non-exhaustive

20  list of evidence shows that the jury was entitled to consider and conclude that FedEx

21  intentionally discriminated against Goldstine.

22       There was also sufficient evidence that the discriminatory actions were attributable to

23  FedEx through traditional principals of agency. FedEx argues that Appesland was the only

24

1   managerial person and he was merely following safety protocols. But the jury heard contrary

2   evidence showing Appesland's animus and his role in the process of Goldstine being decertified

3   on account of a perceived or actual disability. And Rogers acted on Appesland's observations

4   and animus, which was communicated to her through Tayman via Carlson. And Rogers herself

5   was sufficiently senior to be treated as FedEx's proxy relative to Goldstine—her decision

6   precluded Goldstine from working. See Passantino, 212 F.3d at 516. And as the HR employee

7   with broad oversight duties, Tayman was also sufficiently senior to be treated as FedEx's proxy

8   as to Goldstine when selectively shared or refused to share information with Rogers about

9   Goldstine. See id. The fact that FedEx compartmentalizes managerial functions does not

10   convince the Court that only Appesland's acts are attributable to FedEx—though they alone are

11   sufficient to support the punitive damage award. The Court finds no error in permitting the jury's

12   decision to award punitive damages.

13         **2.    Emotional Damages Remittitur**

14         FedEx asks for remittitur or a new trial on the jury's $1.75 million emotional damage

15   award. FedEx argues that the award is unsupportable because Goldstine's emotional damages

16   were "relatively minor" and "occurred over a short time (three months)" and that Goldstine's

17   cancer diagnosis improperly incited the jury's passion and prejudice against FedEx. (Def. Mot. at

18   12 (Dkt. No. 350).) FedEx asks for a new trial or for remittitur to $200,000, which it claims

19   accords with the outcome in a case with a similar "garden variety" emotional damages claim. (Id.

20   (citing Johnson v. Albertsons LLC, No. 2:18-01678-RAJ, 2020 U.S. Dist. LEXIS 117070, at *13

21   (W.D. Wash. July 2, 2020) (remitting non-economic damages award from $750,000 to $200,000

22   where emotional harm from retaliation was based on "meager evidence" over a 2-year period)).)

23

24

1    The Court reviews a "jury verdict of compensatory damages for substantial evidence,"

2    and "will not disturb an award of damages unless it is clearly unsupported by the evidence." In re

3    Exxon Valdez, 270 F.3d 1215, 1247–48 (9th Cir. 2001) (quotation and citation omitted). The

4    Court must "afford substantial deference to a jury's finding of the appropriate amount of

5    damages," and "uphold the jury's findings unless the amount is grossly excessive or monstrous,

6    clearly not supported by the evidence, or based only on speculation or guesswork." Id. (citation

7    and quotation omitted). Substantial emotional distress damages awards need not be supported by

8    "objective" evidence and subjective testimony of the plaintiff, corroborated by others (including

9    relatives), may be sufficient. See Passantino, 212 F.3d at 513–14 (noting that case law, including

10   Washington State cases, does not require emotional distress damages awards to be supported by

11   "objective" evidence); see Bunch v. King Cty. Dep't of Youth Servs., 155 Wn.2d 165, 181

12   (2005); see also Zhang, 339 F.3d a1040 (9th Cir. 2003) (in § 1981 case, stating that plaintiff's

13   "testimony alone is enough to substantiate the jury's award of emotional distress damages,"

14   which court estimated could be more than $200,000). Subjective testimony of the plaintiff,

15   corroborated by others (including relatives), may be sufficient. See Passantino, 212 F.3d at 513–

16   14. "When the court, after viewing the evidence concerning damages in a light most favorable to

17   the prevailing party, determines that the damages award is excessive," it may either grant a new

18   trial or deny the motion if the prevailing party accepts "a reduced amount of damage which the

19   court considers justified." Seymour v. Summa Vista Cinema, Inc., 809 F.2d 1385, 1387 (9th

20   Cir.), amended, 817 F.2d 609 (9th Cir. 1987) (quotation omitted). But "[t]he fact that a jury may

21   have been outraged by the defendant's conduct to the point of awarding excessive damages does

22   not prove that its decision on liability was flawed." Id.

23

24

1      Though the jury's noneconomic damage award was large, the jury heard evidence of

2  Goldstine's emotional distress when he faced a cancer diagnosis without an insurance and with

3  sufficient funds for surgery. Goldstine testified that it was the "[s]cariest damn thing I've ever

4  encountered." And he described the fear he could not afford the necessary surgery and the shame

5  he felt when he had to rely on friends and family to pay the medical bills. Goldstine's testimony

6  was supported by his friend, Dennis Raymond, who detailed his friend's emotional plight. This

7  evidence together was persuasive and supports the award. And the jury also heard evidence

8  sufficient to support a causal link between FedEx's discriminatory conduct and Goldstine's peril

9  of not having health benefits when diagnosed with cancer. The jury's award was also based on

10  the testimony provided about Goldstine's distress during the three months when he was "stood

11  down." Goldstine testified that he was hopeless and confused and began to withdraw. His friend,

12  Raymond, said that Goldstine was "hurt" and "outraged" and was "victimized" by the claims of

13  dishonesty. There was no evidence that Goldstine lost sleep, had anxiety, or sought medical

14  treatment for any emotional condition. But the jury heard sufficient evidence of Goldstine's

15  emotional distress caused by FedEx's discriminatory acts that would make remittitur or a new

16  trial improper. It cannot be said that the award "is grossly excessive or monstrous, clearly not

17  supported by the evidence, or based only on speculation or guesswork." In re Exxon Valdez, 270

18  F.3d at 1247–48.

19      FedEx argues that there is no causal link between Goldstine's termination and the cancer

20  diagnosis because, as the mitigation award suggests, Goldstine could have returned to work at

21  FedEx. This, it argues, confirms that the jury acted solely out of passion and prejudice. (Def. Mot

22  at 10 (Dkt. No 350 at 11).) But the mere fact that Goldstine could have returned at some point in

23  time to FedEx does not mean that causation is absent. And from the jury's mitigation award the

24

1   Court cannot conclude the jury believed Goldstine should have returned to FedEx before the

2   cancer diagnosis. FedEx also argues that the parties stipulated to the lack of causal connection

3   between the 2019 cancer diagnosis and FedEx's conduct in 2017. But the stipulated fact only

4   states that "FedEx Freight did nothing to cause or exacerbate any medical condition of Mr.

5   Goldstine." (Fourth Amended Pretrial Order, Admitted Fact 7 (Dkt. No. 296).) Goldstine does

6   not argue that FedEx caused his cancer or a medical condition. Nor does the Court construe

7   Goldstine's emotional suffering to constitute a "medical condition," particularly since Goldstine

8   sought no medical treatment for his emotional distress. The jury was entitled to consider all of

9   the evidence of Goldstine's emotional suffering presented at trial and the Court does not find a

10  failure of proof of causation.

11       **3.**        **Punitive Damages Remittitur**

12       FedEx also requests "[a]s an alternative" that the Court remit the punitive damages to $0.

13  (See Def. Mot. at 12 lines 9-11 (Dkt. No. 350).) FedEx does not justify this request.

14       In assessing the reasonableness of a punitive damage award, the Supreme Court

15  "established three 'guideposts' for courts to use in determining whether a punitive damage award

16  is grossly excessive: (1) the reprehensibility of the defendant's conduct; (2) the ratio of the award

17  to the harm inflicted on the plaintiff; and (3) the difference between the award and the civil or

18  criminal penalties in comparable cases." In re Exxon Valdez, 270 F.3d at 1240 (citing BMW of

19  N. Am., Inc. v. Gore, 517 U.S. 559, 575-83 (1996)).

20       FedEx cites to no law supporting its request and provides no argument as to why the

21  punitive award was excessive. The Court rejects this unsupported argument.

22       **4.**        **Improper Jury Instructions**

23       FedEx renews its objections to certain jury instructions, which the Court again rejects.

24

1    First, in support of its argument, FedEx cites to and incorporates "[t]he reasons set forth

2    in Dkt. 315." (Def. Mot. at 11 (Dkt. No. 350 at 12).) But Docket Entry 315 is Goldstine's

3    Opposition to FedEx's Motion for Directed Verdict and contains no arguments to support

4    FedEx's motion. The Court is therefore without any arguments to consider or cause to reconsider

5    any jury instructions through this errant citation.

6    Second, FedEx takes issue with the Court's instruction allowing the jury to consider

7    Goldstine's impairment with the benefit of mitigating measures like a prosthesis because

8    "Plaintiff's claimed disability is the limited range of motion caused by his total knee

9    replacement." (Dkt. No. 350 at 12.) But the knee replacement implanted a new joint, which

10   otherwise mitigated Goldstine's more serious knee injury. This was an appropriate instruction.

11   Even if it was not, FedEx fails to explain how this impacted the trial or how it confused the jury,

12   particularly since there was abundant evidence presented that FedEx perceived Goldstine as

13   disabled and had a record of his disability. The Court finds no merit in this argument.

14   Lastly, FedEx takes issue with the Court's decision to allow a punitive damage

15   instruction. But the Court rejects this argument for the same reasons explained above.

16   **5.    New Trial Due to Evidentiary Rulings**

17   FedEx claims the Court erred in making rulings on motions in limine "E, 1, 5, 9 & 10"

18   and a new trial should be held. (Dkt. No. 350 at 13.) The Court remains unconvinced.

19   FedEx renews its request to exclude testimony about Goldstine's cancer diagnosis. (See

20   Motion in Limine E and Supplemental Motion in Limine 1.) FedEx argues that the testimony

21   was subject to exclusion under Rules 401, 402, 403, 702, and 802 because it had no probative

22   value and, even if it did, it was far outweighed by its prejudicial nature—as evidenced in the

23   large emotion damages award. (Def. Mot. at 13 (Dkt. No. 350).) The Court disagrees.

24

1   Goldstine's cancer diagnosis was relevant to the claimed damages, including the emotional

2   distress. Goldstine was entitled to present to the jury evidence that after being discriminated

3   against he found himself facing a cancer diagnosis without insurance or sufficient money for

4   treatment. While the cancer was not caused by FedEx, the lack of insurance was fairly traceable

5   to its discriminatory conduct. The Court rejects FedEx's argument.

6        FedEx renews three other motions in limine, all of which the Court rejects. First, it argues

7   the jury should not have seen evidence of Goldstine's knee scars. But the knee scars were

8   relevant to the issue of whether Goldstine was disabled and the Court limited Goldstine to

9   showing a photo of the scar, rather than revealing it live to the jury. It was not prejudicial to

10  allow the jury to see this picture. Second, FedEx renews its request to exclude Dr. Hoffman's

11  expert opinion because it is based on hearsay. As the Court explained to the parties, "experts are

12  entitled to rely on hearsay in forming their opinions." Carson Harbor Village, Ltd. v. Unocal

13  Corp., 270 F.3d 863, 873 (9th Cir. 2001); see Fed. R. Evid. 703. Third, FedEx renews its request

14  to exclude Feldheger's opinion that Goldstine was qualified to return to work. There are no

15  grounds to undo that ruling, as Feldheger's opinion was based on his observation and experience.

16       **6.**     **Remote Trial Violates Constitutional Rights**

17       FedEx argues that the remote jury trial violated the Seventh Amendment and Rule 43(a),

18  as well as General Order No. 15-20. The argument is legally and factually untenable.

19       Both Rule 77(b) and 43(a) permit the Court to convene a jury trial by contemporaneous

20  video conferencing technology. See Liu v State Farm Mut. Auto. Ins. Co., No. 18-1862-BJR,

21  Dkt. No. 83 (W.D. Wash. Dec. 17, 2020); Gould Elecs. Inc. v. Livingston Cty. Rd. Comm'n, 470

22  F. Supp. 3d 735, 738 (E.D. Mich. 2020). First, Rule 77(b) provides that "[e]very trial on the

23  merits must be conducted in open court and, so far as convenient, in a regular courtroom."

24

1    (emphasis added). This admonishment permits a flexible definition of open court. Trials may be

2    conducted in a non-traditional manner when "exigencies make traditional procedures

3    impracticable." Gould, 470 F. Supp. 3d at 738. In times of crises, like hurricanes and floods,

4    courts have adapted and held court in unusual places. Second, Rule 43(a) provides that "[f]or

5    good cause in compelling circumstances and with appropriate safeguards, the court may permit

6    testimony in open court by contemporaneous transmission from a different location." Like Rule

7    77(b), Rule 43(a) affords flexibility when circumstances dictate something other than in-court

8    proceedings.

9         The Court enjoys broad discretion to determine whether good cause and compelling

10   circumstances exist under Rules 77(b) and 43(a) to conduct remote civil jury trials. Thomas v.

11   Anderson, 912 F.3d 971, 977 (7th Cir. 2018) ("[U]nder Rule 43(a), the judge has discretion to

12   allow live testimony by video for 'good cause in compelling circumstances and with appropriate

13   safeguards.'") cert. denied 140 S.Ct. 533 (2019); see also Gould, 470 F. Supp. 3d at 740

14   ("Determining whether good cause and compelling circumstances exist is a matter left to the

15   court's discretion."). "The most persuasive showings of good cause and compelling

16   circumstances are likely to arise when a witness is unable to attend trial for unexpected reasons,

17   such as accident or illness, but remains able to testify from a different place." Fed. R. Civ. P.

18   43(a) advisory committee's note to 1996 amendment.

19        Good cause and compelling circumstances existed to conduct the jury trial remotely

20   through the Court's video conferencing platform—Zoom.Gov. The reasons were multifactorial.

21   On February 29, 2020 Governor Jay Inslee declared a state of emergency in Washington in

22   response to the COVID-19 pandemic. See Proclamation of the Governor No. 20-05 (Feb. 29

23   2020). Shortly after, the Court issued General Order No. 01-20, continuing all civil and criminal

24

1    in-person matters "[g]iven the significant number of identified and projected cases of COVID-19

2    in this District and the severity of risk posed to the public. . . ." General Order No. 01-20 at 2. By

3    late Fall 2020, the COVID-19 pandemic continued to disrupt the normal operation of the Court

4    and quotidian routines throughout Washington. And on October 2, 2020, the Court issued

5    General Order No. 15-20—in effect at the start of the trial—which stated, in part:

6            In the last two months, the daily number of positive cases, hospitalizations, and deaths
             have significantly decreased in the Western District of Washington. This, combined with
7            the deployment of Courthouse procedures designed to reduce the spread of COVID-19,
             now allows for a limited number of individuals to safely enter these facilities for critical
8            in-person criminal proceedings. However, limiting the size and frequency of gatherings
             remain critical to preventing serious injury and death from COVID-19.
9
10   General Order No. 15-20 at 1. The General Order continued the restriction on in-person criminal

11   and civil matters, but stated that "Remote video proceedings are permitted in civil cases,

12   including jury trials with jurors participating remotely." Id. at 2. This Order applied at the time of

13   this trial. Additionally, the Court's public elevators were out of service at the time of trial,

14   making the Court's 14th floor courtroom inaccessible to some and impractical for everyone. To

15   put it mildly, exigencies existed requiring nontraditional methods of conducting the trial.

16           The Court went to lengths to provide adequate safeguards so that the parties to the remote

17   jury trial received a fair trial. Well before this trial, the Court convened a committee to study the

18   potential of using the Zoom.Gov platform to conduct remote civil jury trials during the COVID-

19   19 pandemic. The Court's Committee studied the practical and technical safeguards that could be

20   put in place to provide a fair proceeding to litigants. The Committee also worked to ensure that

21   jurors who lacked access to technology, training, or the internet could participate. After gathering

22   data and conducting a mock remote civil jury trial, the Committee issued a detailed set of

23   procedures for both Court staff and participating attorneys to follow. A copy of the handbook

24   issued for attorneys that was in effect at the time of the trial is appended to this Order as

ORDER DENYING RULE 50 AND RULE 59 POST-TRIAL MOTIONS AND CONCLUDING PLAINTIFF'S
ADA RETALIATION CLAIM IS MOOT - 24

1    Appendix A. The Court also issued an order in this case setting the standards for the remote jury

2    trial, including as to witness and exhibit preparation and the conduct of counsel. (See Order for

3    Remote/Virtual Civil Jury Trial (Dkt. No. 284).) And the Court discussed the remote trial

4    process at length with counsel during several pretrial conferences. (See Dkt. No. 267, 283, 293.)

5         The remote jury trial process implemented in this District works effectively to reproduce

6    the core components of a civil trial. The Zoom.Gov platform permits the instantaneous

7    transmission of live video testimony to all parties and jurors. It allows the parties to pose

8    questions to witnesses and interpose objections. It also allows the Court to make rulings on

9    objections, hold side bars, and excuse the jury to deliberate in a "virtual" jury room where jurors

10   can each view admitted exhibits on their own device. The platform also enables jurors to ask

11   questions of the witnesses, which helps should whether the jurors are paying attention to the

12   proceedings. During this trial, the Court employed two courtroom deputies to monitor the

13   proceedings and juror attention. Jurors and the Court are able to assess witness demeanor and

14   credibility in much the same way as happens in open Court—with the added benefit of seeing

15   faces head-on.

16        To convene a jury for this case, the Court summoned 100 potential jurors, 31 of whom

17   participated in voir dire. As part of the juror orientation and prior to voir dire, the Court required

18   the jurors to complete a questionnaire that the parties prepared. And to accommodate requests

19   from counsel, the Court conducted two rounds of voir dire so that counsel could view all jurors

20   on a single computer monitor. After these voir dire rounds and allowing the parties to make for-

21   cause and peremptory challenges, the Court empaneled 8 jurors. The Court then read the

22   preliminary jury instructions and the eight-day trial commenced. The parties put on 14 live

23   witnesses who appeared on screen without masks and whose facial expressions and demeanor

24

1   could be readily discerned. All eight jurors participated in the eight-day trial. While there were

2   issues with internet connectivity impacting jurors and both parties, the Court found the delays

3   were not undue when compared to typical delays inherent in in-person trials. The Court and its

4   two courtroom deputies monitored the jurors to ensure they were paying attention. The jury

5   showed its attention by asking pertinent and detailed questions of each witness. And while the

6   jurors were appearing remotely from their homes, the Court found that the jurors took their role

7   seriously and none showed signs of distraction. After the parties' closing arguments, the Court

8   read the final set of instructions to the jury and sent them to the virtual jury room to deliberate

9   where each juror had unfettered access to review the admitted exhibits. After more than a full

10  day of deliberations, the jury returned its verdict. The Court polled each juror and confirmed the

11  verdict was that of each juror.

12      FedEx's motion fails to demonstrate how the remote civil jury trial violated the Seventh

13  Amendment, Rule 43 or General Order No. 15-20. As demonstrated above, the process provided

14  all of the necessary safeguards under the Seventh Amendment and Rule 43. And it abided by

15  General Order No. 15-20's explicit permission to hold remote civil jury trials. See General Order

16  No. 15-20 at 2. FedEx's opening motion fails to provide any evidence to supports the arguments

17  presented and the Court finds it unconvincing. In its reply, FedEx offered a lengthy declaration

18  from one of its three trial attorneys, Medora Marisseau. Though the declaration could be stricken

19  because it should have been filed with the opening brief, the Court considers and responds to it.

20      First, counsel complains that she was unable to communicate with her client during the

21  trial because they were physically separated. (Marisseau Decl. ¶ 5 (Dkt. No. 387).) But this

22  "problem" was of counsel's own creation. Nothing in the Court's pretrial orders required counsel

23  and client to be in separate rooms. The remote jury trial handbook advised counsel that

24

1    "Witnesses, counsel, and parties should be in locations that are suitable for trial." Handbook at 4.

2    The handbook specifically stated:

3         Counsel should confer regarding the following issues and advise the Court of any
         agreements or issues to be resolved:
4         • The equities for witness and counsel participation in the Zoom trial, including
           whether:
5              ▪ the part(ies) may be in the same physical space as their counsel.

6    Handbook at 4. Neither before nor during trial did Counsel raise any concern about being unable

7    to be in the same location as her client, despite this admonition. And throughout the trial,

8    FedEx's representative appeared to be in the same room as one of the trial team attorneys. Had it

9    been important to share the same room, counsel should have made arrangements to

10   accommodate her own preferences. At the very least, counsel should have raised the concern

11   with the Court before or during trial rather through a post-trial declaration.

12            Second, counsel claims she could not effectively communicate with jurors and witnesses

13   because she could not read their reactions and because she could not focus on witnesses and the

14   jury at the same time. (Marisseau Decl. ¶ 6.) The Court is unconvinced. First, the technology

15   used allowed counsel to create her own rapport with jurors and witnesses in much the same way

16   as occurs in person. The Court found engaging with jurors and witnesses straightforward and

17   gauging reactions and demeanor easy. Second, Counsel's statement overlooks the fact that in an

18   in-person trial, counsel would not be able to simultaneously focus on a witness and the jurors any

19   more effectively than she could on Zoom.Gov. In both settings, counsel must shift focus between

20   the witnesses and the jury. And in the courtroom, the faces of witnesses and jurors will be far

21   smaller than they appear on Zoom.Gov. Moreover, had the Court been able to conduct the trial

22   in-person, witnesses and jurors would have most likely been wearing masks, making assessments

23   of demeanor far more difficult than on Zoom.Gov where they were mask-less.

24

1    Third, counsel claims "[t]he technology also limited my ability to assert objections"

2  because her objection was not heard due to a "built-in delay" or because she was muted.

3  (Marisseau Decl. ¶ 8.) This contention borders on frivolous. Counsel was fairly presented with

4  every opportunity to make her objections on the record. If counsel had muted her own

5  microphone or did not hear her objection go through due to her claim of "built-in delay," then

6  she should have made every effort to put her objection on the record even if it came mid-answer

7  or interrupted the questioning. Indeed, the Court's Order on the Remote Trial specified that

8  counsel should also raise her hand to make objections. (See Dkt. No. 284 at 6.) If counsel's

9  objections do not appear in the record, their absence is fairly attributable to counsel's failure to

10  act and cannot be blamed on the technology.

11    Fourth, counsel claims that her opposing counsel used objectionable demonstratives and

12  that the record does not show their use because the proceedings were not "videotaped."

13  (Marisseau Decl. ¶¶ 9-10.) The argument lacks merit. First, in-person civil trials are not recorded

14  in this District, meaning that there would similarly be no audio/visual record. Second, counsel

15  did, in fact, make objections to the use of demonstratives, many of which the Court sustained.

16  Third, just as would be the case in an in-person trial, it is up to counsel to make objections as to

17  non-verbal conduct on the record. Counsel's failure to make a complete record cannot properly

18  be attributed to the remote nature of the proceedings. And counsel's complaints about a sketch

19  used in closing fails to acknowledge that counsel made <u>no</u> objection to it during the argument.

20  Counsel's late-conceived objection lacks merit.

21    Lastly, counsel contends that "every federal Zoom jury trial to date has resulted in

22  million dollar plus verdicts." (Marisseau Decl. ¶ 14.) This is factually incorrect. Of the four

23  remote civil jury trials the undersigned has been conducted, this is the only one to result in a jury

24

ORDER DENYING RULE 50 AND RULE 59 POST-TRIAL MOTIONS AND CONCLUDING PLAINTIFF'S
ADA RETALIATION CLAIM IS MOOT - 28

1   verdict over $1 million. One case ended mid-trial with a settlement, one trial resulted in a jury

2   verdict below $1 million, and the jury in the final cases reached a verdict in favor of the

3   defendants. Counsel's argument also fails to explain why it would be fair to compare this case to

4   any of the others that have been tried remotely or in-person. Nor can one conclude from the size

5   of a verdict alone whether the jury's award was based on an "anti-defendant" bias. Indeed, an

6   award of $1 million may well be a mere fraction of the requested damages. The inaccurate data

7   counsel cites does not convince the Court that there is any structural bias against defendants in

8   the remote jury process.

9       The Court finds no legal or factual merit in FedEx's argument in support of its claim that

10   the remote jury process was improper or unfair. It is the Court's firm belief that the trial abided

11   by the dictates of the Constitution and Rules 43 and 77, and it was explicitly permitted by

12   General Order No. 20-15. Proceeding remotely enabled the parties to seek resolution to two-

13   plus-year-old case that had already been through one mistrial. The jurors gave FedEx their

14   devoted attention and they reached the verdict they did based on the evidence and testimony

15   presented and the skill of counsel. The Court finds no basis on which to grant FedEx's Motion,

16   which it DENIES the Motion on this issue.

17       **7.**    **Motion to Strike**

18       Through his surreply, Goldstine asks the Court to strike: (1) Marisseau's declaration filed

19   with the reply; (2) Elliot's declaration in support of the reply; (3) 49 pages of trial transcripts

20   appended to Elliot's declaration (Exhibits M, O, R, S, and T to the Elliot Declaration); (4) 1.5

21   pages of FedEx's overlength reply; and (5) new arguments raised in the reply. The Court

22   GRANTS in part and DENIES in part the motion. The Court also notes that FedEx filed a

23   response to the surreply, which violates Local Rule 7(g)(4)'s commandment that "No response

24

ORDER DENYING RULE 50 AND RULE 59 POST-TRIAL MOTIONS AND CONCLUDING PLAINTIFF'S
ADA RETALIATION CLAIM IS MOOT - 29

1  shall be filed unless requested by the court." FedEx failed to follow this dictate and the Court

2  STRIKES the response.

3  First, as explained above, although Marisseau's declaration could be stricken, the Court

4  considered it in rejecting FedEx's motion. The Court DENIES the motion as to this declaration.

5  Second, the portions of trial transcripts appended to Elliot's declaration should have been

6  raised to support the opening briefing. The Court therefore STRIKES exhibits M, O, R, S, and T

7  to the Elliot Declaration, though not the declaration itself.

8  Third, FedEx's reply was overlength, running 3 pages over the limit. Goldstine has only

9  asked the Court to strike the final 1.5 pages. While the Court could strike all overlength pages, it

10  STRIKES only the 1.5 that Goldstine identifies. The Court GRANTS the motion on this issue.

11  Goldstine also asks the Court to strike new arguments and "all new material not in strict

12  reply to Goldstine's arguments." (Surreply at 3.) But Goldstine fails to identify what the new

13  arguments are and leaves the Court to guess. The requested relief is too vague to apply, and the

14  Court DENIES it.

15  **8.     Attorneys' Fees**

16  Goldstine asks the Court to award him his reasonable attorneys' fees incurred in opposing

17  FedEx's Motion. The Court agrees and will award Goldstine his reasonable attorneys' fees. The

18  Court will address the specific amount in its order on Goldstine's Motion for Attorneys' Fees

19  (Dkt. No. 332).

20  **CONCLUSION**

21  The Court finds no merit in either post-trial motion advanced by the parties. The Court

22  finds no basis to disturb the jury's verdict or to order a new trial. The Court therefore DENIES

23  both motions. The matter of Goldstine's award of reasonable attorneys' fees for his opposition to

24

1   FedEx's Motion shall be resolved in a separate order on Goldstine's Motion for Attorneys' Fees

2   (Dkt. No. 332).

3          The clerk is ordered to provide copies of this order to all counsel.

4          Dated March 11, 2021.

5          _____

6          Marsha J. Pechman
           United States District Judge